**In Re Phillip Jay BLODGETT, Alleged Psychopathic Personality.**

No. C9–92–844.

Supreme Court of Minnesota.

Jan. 14, 1994.

Richard C. Ilkka, Stillwater, for appellant.

Richard M. Arney, Washington County Atty., Douglas G. Swenson, and Susan Steffen Tice, Asst. Washington County Attys., Stillwater, for Washington County.

Hubert H. Humphrey, III, Atty. Gen., Kathy Meade Hebert, and Cheryl W. Heilman, Sp. Asst. Attys. Gen., St. Paul, for the State.

Deborah Gilman, John E. Grzybek, and Richard K. Ellison, Minneapolis, amicus curiae for MCLU.

SIMONETT, Justice.

Petitioner Phillip Jay Blodgett challenges the constitutionality of the Minnesota Psychopathic Personality Commitment Act, Minn.Stat. § 526.09–.10 (1992), under which he has been committed to the Minnesota Security Hospital as a psychopathic personality. We conclude, as did the lower courts, that the Act is constitutional, and affirm.

Blodgett, now 28, has a history of sexual misconduct and violence beginning when he was 16 years old. In January 1982, Blodgett was adjudicated a delinquent in Pierce County, Wisconsin, for having sexual contact with his brother. Seven months later, Blodgett was again found delinquent after being charged for misdemeanor battery of a social worker. In May of 1985, the Washington County District Court found Blodgett guilty of a misdemeanor charge of violating a domestic abuse restraining order.

On September 18, 1985, three hours after his release from the Washington County Jail where he served time for convictions for burglary and obstructing the legal process, Blodgett broke into the home of the parents of his ex-girlfriend, entered the room where his ex-girlfriend was sleeping, and sexually assaulted her. For this conduct Blodgett pled guilty, on January 16, 1986, and was sent to prison on a charge of first degree burglary for entering a dwelling with the intent to commit criminal sexual conduct.

On May 9, 1987, while enrolled in the prerelease program at Lino Lakes (under which an inmate leaves the prison during the day but must return at night), Blodgett sexually assaulted a woman in the parking lot of a supermarket while attempting to steal her car. Blodgett grabbed the woman, pushed her into the front seat, shoved his hand in her mouth, hit her on the side of the head, put his hand between her legs and squeezed and rubbed her genital area. When the woman resisted and screamed for help, Blodgett asked her, "Do you want to die?" Five weeks later, June 15, 1987, while on supervised release to a half-way house and enrolled in a treatment program in St. Paul, Blodgett raped a 16–year–old girl both vaginally and anally. As a result of these incidents, Blodgett pled guilty to two counts of criminal sexual conduct in the second degree and was returned to prison.

Shortly before Blodgett's scheduled release date in 1991, Dr. Richard Friberg evaluated him pursuant to the Department of Corrections' new risk assessment and release procedures.[1] By letter dated September 19, 1991, Dr. Friberg informed the Washington County Attorney that, in his view, Blodgett met the criteria for commitment under the psychopathic personality statute.

---

1. Frank W. Wood, *Risk Assessment and Release Procedures for Violent Offenders/Sexual Psychopaths* (1991). The introduction to the section entitled Institution Procedures for Identification, Monitoring and Release of Public Risk Monitoring Cases reads as follows:

    These procedures are designed to create a uniform screening process and criteria to be used by institution program review teams for the identification of offenders already in or entering the corrections system whose behaviors prior to commitment or related to the offender's committing offense or during incarceration indicate that the offender is a candidate for civil commitment as a psychopathic personality or may represent a risk to the public upon release.

A petition for commitment was promptly filed by the Washington County Attorney, and an initial hearing was held on October 10 and 11, 1991. Evidence was received that Blodgett had an abused childhood in a dysfunctional family; that he had elevated MMPI scores and an addiction to both drugs and alcohol; and that although offered a "litany" of treatment programs, he had refused them all. The five psychologists who testified at the hearing agreed that Blodgett had an antisocial personality disorder, that he was chemically dependent, and that he was dangerous. Four of the five experts stated they felt Blodgett met the statutory definition of a psychopathic personality. When two of these four were questioned further about their understanding of the term "psychopathic personality," one, Dr. Richard Friberg, explained that he relied solely on Minn.Stat. § 526.09 for his definition. The other, Dr. James Jacobson, stated that he had read the statute and had a copy of the relevant case law. Dr. John Austin, who opposed Blodgett's commitment, stated he relied on "the definitions [he] was aware of in [the] Minnesota statute and at least the Minnesota Supreme Court's interpretation of that [statute] in [the] *Pearson* case." The court found by clear and convincing evidence that Blodgett is a psychopathic personality. Blodgett was committed to the Minnesota Security Hospital (MSH) in St. Peter and the hospital was ordered to file an evaluation report within 60 days. Sections 526.10, subd. 1, and 253B.18, subd. 2 (1992).

The MSH staff filed a report with the court, diagnosing Blodgett as suffering from polysubstance abuse and an antisocial personality disorder, but opposing his commitment as a psychopathic personality. A final court hearing was commenced on January 6, 1992, at which time Blodgett moved to dismiss the proceedings on the grounds "that Minnesota Statute Section 526.09 is unconstitutional." At the hearing, Dr. Jacobson, who had performed the second court-ordered examination, diagnosed Blodgett as having an antisocial disorder, a substance abuse disorder, and a psychopathic personality, and said that Blodgett met the criteria of Minn.Stat. § 526.09. Dr. Michael Farnsworth, MSH senior staff psychiatrist, opposed commitment, contending that any treatment Blodgett could receive at the hospital would be "sham" or "placebo" treatment.

Finally, on April 2, 1992, the trial court issued its decision finding that Blodgett continued to meet the criteria for commitment as a psychopathic personality and that there was no reasonable, less restrictive alternative to commitment. After further determining that the statute was constitutional, the trial court ordered Blodgett committed to the security hospital for an indeterminate period of time.

On appeal, the court of appeals ruled that the trial court's finding that Blodgett was a psychopathic personality was not clearly erroneous and that Blodgett's commitment as a psychopathic personality was not unconstitutional. *In re Blodgett*, 490 N.W.2d 638 (Minn.App.1992). Blodgett then petitioned this court for further review, raising, however, only the constitutional challenge. In other words, Blodgett does not challenge here the findings that he has an uncontrollable sexual impulse dangerous to others. We granted review.

Blodgett's claim of unconstitutionality has two parts: (1) that § 526.10 violates his right to substantive due process; and (2) that the statute violates equal protection under the Minnesota and United States Constitutions.[2]

## I.

■ Minnesota, like other states, has wrestled long with the legitimate public concern over the danger posed by predatory sex offenders and the question of how to deal with that concern.[3] In 1939, the Minnesota

---

**2.** We also granted leave to the Minnesota Civil Liberties Union to file an amicus brief. Because our review is limited to the issues raised by appellant Blodgett, we do not consider the additional issues raised by amicus.

**3.** Minnesota is one of 13 jurisdictions with a sexual psychopath statute: Colorado, Connecti-cut, Illinois, Massachusetts, Minnesota, Nebraska, New Jersey, Oregon, Tennessee, Utah, Virginia, Washington, and the District of Columbia. Gary Gleb, Comment, *Washington's Sexually Violent Predator Law: The Need to Bar Unreliable Psychiatric Predictions of Dangerousness from*

Legislature passed a law, now codified as Minn.Stat. § 526.10, providing for the civil commitment of any person found to be a psychopathic personality. The term "psychopathic personality" is defined as

the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with respect to sexual matters and thereby dangerous to other persons.

Minn.Stat. § 526.09. Originally, the laws relating to insane persons, rather than the laws relating to the dangerous insane, were made applicable to persons with a psychopathic personality. Minn.Stat. § 526.10 (1941). In 1969, § 526.10 was amended to make "the provisions of chapter 253A, pertaining to persons mentally ill and dangerous to the public," applicable to psychopathic personalities. Minn.Stat. § 526.10 (1969).[4]

Soon after its enactment, the psychopathic personality statute was challenged on the grounds that it was unconstitutionally vague. *State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 287 N.W. 297 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). In responding to the vagueness challenge, this court in *Pearson* recognized that "[i]t would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. Such a definition would * * * make the act impracticable of enforcement, and perhaps, unconstitutional in its application." Consequently, the court employed principles of statutory interpretation to narrow the reach of the statute to only

those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.

205 Minn. at 555, 287 N.W. at 302. Our court determined that, with these additional criteria, the act was not so indefinite or uncertain as to make it void for vagueness under the Fourteenth Amendment of the United States Constitution. The case was then appealed to the United States Supreme Court.

■■■ In a unanimous opinion authored by Chief Justice Charles Evans Hughes, the United States Supreme Court affirmed, holding the statute, as construed, was not so vague and indefinite as to be invalid. *Minnesota ex rel. Pearson v. Probate Court of Ramsey County, Minn.*, 309 U.S. 270, 274, 60 S.Ct. 523, 526, 84 L.Ed. 744 (1940), *aff'g* 205 Minn. 545, 287 N.W. 297 (1939). In the Court's view, "[t]hese underlying conditions, calling for evidence of past conduct pointing to probable consequences are as susceptible of proof as many of the criteria constantly applied in prosecutions for crime." *Id.* The Court also rejected Pearson's claim that the statute violated the Equal Protection Clause of the Fourteenth Amendment. Using a rational basis test, the Court stated that "the legislature is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." *Id.* 309 U.S. at 275, 60 S.Ct. at 526. Finally, the Court found Pearson's procedural due process objections premature, but assumed "that the Minnesota courts will protect appellant in every constitutional right he possesses." *Id.* at 277, 60

*Civil Commitment Proceedings*, 39 UCLA L.Rev. 213, 215 (1991).

In 1959, 26 states and the District of Columbia had sexual psychopath statutes but, except for the 13 jurisdictions above listed, have since repealed their statutes. *See* Alan H. Swanson, Comment, *Sexual Psychopath Statutes; Summary and Analysis*, 51 J.Crim.L. & Criminology 215, app. at 228–35 (1960–61).

4. Chapter 253B, formerly chapter 253A, includes the discharge provisions, section 253B.18, subd. 15 (1992), whereby a person committed as a psychopathic personality remains confined until showing to the satisfaction of the commissioner and the special review board that the person "is capable of making an adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision."

S.Ct. at 527. Recently, the constitutionality of our psychopathic personality statute was again upheld by the Eighth Circuit in *Bailey v. Gardebring*, 940 F.2d 1150 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992).

In this case, Blodgett argues that *Pearson* should not be controlling because in recent years the United States Supreme Court has decided a number of cases, especially *Foucha v. Louisiana*, —— U.S. ——, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), which have restricted a state's power to confine individuals in a noncriminal setting.[5] To live one's life free of physical restraint by the state is a fundamental right; curtailment of a person's liberty is entitled to substantive due process protection. *See, e.g., Foucha*, —— U.S. at ——, 112 S.Ct. at 1785; *Jones v. United States*, 463 U.S. 354, 361, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983). The state must show a legitimate and compelling interest to justify any deprivation of a person's physical freedom. *E.g., United States v. Salerno*, 481 U.S. 739, 748, 107 S.Ct. 2095, 2102, 95 L.Ed.2d 697 (1987).

Here the compelling government interest is the protection of members of the public from persons who have an uncontrollable impulse to sexually assault. In this case it has been clearly and convincingly established that Blodgett is dangerous, and that there is a substantial likelihood that he will sexually assault again, as he has in the past. Blodgett contends, however, that having served his allotted time in prison, he is entitled to his freedom.

The heart of Blodgett's argument is that although he may be socially maladjusted, he is not in any way mentally ill. And if he is not ill, he may not be confined by the state, unless and until convicted of another crime. Blodgett points to *Foucha*, which identified three categories of confinement in which a state, under its police power, may constitutionally deprive an individual of his or her liberty: (a) imprisonment of convicted criminals for purpose of deterrence and retribution; (b) confinement for persons mentally ill and dangerous; and (c) in "certain narrow circumstances, persons who pose a danger to others or to the community may be subject to limited confinement," such as pretrial detention of dangerous criminal defendants. *Id.* —— U.S. at —— - ——, 112 S.Ct. at 1785–86. Blodgett says he does not fit within any of these three categories.

Blodgett's argument, really, is that *Foucha* has overruled *Pearson*, even though the United States Supreme Court has not said so. We believe, however, that *Pearson* may be considered either a sub-set of *Foucha's* second category (mentally ill and dangerous), or an additional category.[6]

The argument against the constitutionality of civil commitment for a psychopathic personality is that the condition is not a mental illness, at least not one medically recognized, or at least not yet. But while the term "psychopathic personality" is considered outmoded today, the reality it describes is not; this reality, even if it is not currently classified as a mental illness, does not appear to be a mere social maladjustment.

Mental illness is simply that, an illness, and should be treated no differently than other illnesses and with due respect for personal liberties. When, however, a person is both mentally ill "and dangerous to the public," our legislature has provided for commitment to the state security hospital. Minn. Stat. § 253B.18 (1992). In like measure, and

---

5. In *Foucha v. Louisiana*, —— U.S. ——, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), the United States Supreme Court held that a Louisiana civil commitment statute, which allowed a person acquitted by reason of insanity, who had an antisocial personality disorder but no longer a mental illness, to remain indefinitely committed to a mental hospital on the basis of dangerousness alone, violated substantive due process.

*See also Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (commitment for mental illness); and *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (pretrial commitment of incompetent criminal defendant).

6. It does not appear that the three categories mentioned in *Foucha* were meant to be exclusive. Minnesota, for example, provides for civil commitment without a finding of mental illness in three other situations, namely, Minn.Stat. § 253B.02, subd. 14 (1992) (mentally retarded), Minn.Stat. § 253B.02, subd. 2 (1992) (chemically dependent), and Minn.Stat. § 144.4172, subd. 8 (1992) (a health threat to others).

with like concern, our legislature has provided for commitment of the "psychopathic personality" who, because of an uncontrollable sexual impulse, is dangerous to the public.

The psychopathic personality statute identifies a volitional dysfunction which grossly impairs judgment and behavior with respect to the sex drive. *Compare* Minn.Stat. § 253B.02, subd. 13 (1992) (defining mental illness). The psychopathic personality is sometimes equated with the medically recognized "anti-social personality disorder"; it is, however, limited to sexual assaultive behavior and excludes mere sexual promiscuity.[7] It also excludes other forms of social delinquency. Whatever the explanation or label, the "psychopathic personality" is an identifiable and documentable violent sexually deviant condition or disorder.[8]

▊▊▊ In applying the *Pearson* test, the court considers the nature and frequency of the sexual assaults, the degree of violence involved, the relationship (or lack thereof) between the offender and the victims, the offender's attitude and mood, the offender's medical and family history, the results of psychological and psychiatric testing and evaluation, and such other factors that bear on the predatory sex impulse and the lack of power to control it. Proof of the requisite condition must be by clear and convincing evidence.

As the dissent points out, there apparently have been instances of persons committed as psychopathic personalities who do not fit the *Pearson* definition. The fact that the statute has been misapplied on occasion is not a valid criticism of the statute itself. The remedy for misapplication is not to declare the statute unconstitutional but to appeal erroneous decisions and get them reversed.[9] More pertinent to the facial challenge to the statute are the cases where the statute has been properly applied.[10]

The problem is not what medical label best fits the statutory criteria, but whether these criteria may, constitutionally, warrant civil commitment. Fifty-three years ago the answer was yes, but it is now suggested that the passage of years has outmoded that decision. Yet the "sexual predator"—today's term for yesterday's "psychopathic personality"—seems, if anything, on the increase,

---

7. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 342–46 (3d ed. rev. 1987). The manual indicates that the antisocial personality disorder may at times be characterized by sexual promiscuity.

8. "Sexual offenders have been found to present distorted and disturbed thought processes, as identified in previous research. For example, several studies have reported that men prone towards sexual violence and convicted rape offenders hold false beliefs, distorted perceptions, and irrational justifications concerning violence against women." Margit Henderson & Seth Kalichman, *Sexually Deviant Behavior and Schizotypy: A Theoretical Perspective with Supportive Data*, Psychiatric Quarterly, Vol. 61, No. 4 (Winter 1990) at p. 281. "[T]here are diagnostic implications for identifying schizotypic characteristics among sexual offenders." *Id.* at 282. In our case here, the trial court found that Blodgett had no insight into his misconduct and had no sense of guilt or remorse.

9. *See In re Rodriguez*, 506 N.W.2d 660 (Minn. App. (1993), *rev. denied* (Minn.1993). There the court of appeals reversed a commitment as a psychopathic personality, holding, as a matter of law, the statute does not cover a nonviolent sexual exhibitionist.

10. *See, e.g., Enebak v. Noot*, 353 N.W.2d 544 (Minn.1984). The petitioner was found to have an antisocial personality disorder and was civilly committed. He had sexually assaulted over 37 women in the 15 years prior to his commitment, leaving his last victim prior to commitment, a 16–year–old girl, paralyzed with fractured vertebrae. When transferred to an "open" hospital, he became sexually involved with a mentally retarded patient and on pass from the hospital sexually assaulted another young girl. *See also Matter of Martenies*, 350 N.W.2d 470 (Minn.App. 1984), *rev. denied* (Minn.1984) (sexual sadist with history of sexual assaults).

*See also In the Matter of Dwight (NMN) Walton*, 510 N.W.2d 203 (Minn.1994), the companion appeal to *Blodgett*, also decided today. On January 13, 1986, Walton raped a 13–year–old girl, threatening to shoot her if she made any noise. The next day he forced a 19–year–old woman, at knife point, to have intercourse three times over the course of an hour, during which he moved her to different locations. He was convicted, put in prison, and eventually released on August 15, 1989. Less than a year later, on July 21, 1990, Walton broke into an apartment in a complex where he lived, later admitting he intended to commit rape, but fled when the woman screamed. At a party two months later, he partially disrobed a young woman who had passed out on a couch.

which may be related to the increase in dysfunctional families and substance abuse.[11]

It is next argued that a psychopathic personality condition is untreatable, and, therefore, confinement is equivalent to life-long preventive detention. But it is not clear that treatment for the psychopathic personality never works.[12] It also seems somewhat incongruous that a sexual offender should be able to prove he is untreatable by refusing treatment. *Cf. Matter of Wolf,* 486 N.W.2d 421, 424 (Minn.1992) (A confirmed alcoholic refusing all treatment may be involuntarily committed; "[r]espondent may never agree to be treated, but * * * the state has the power to keep trying.").

But even when treatment is problematic, and it often is, the state's interest in the safety of others is no less legitimate and compelling. So long as civil commitment is programmed to provide treatment and periodic review, due process is provided. Minnesota's commitment system provides for periodic review and reevaluation of the need for continued confinement. A person committed as a psychopathic personality may petition the Commissioner of Human Services at any time for a transfer to an open hospital or for a provisional discharge to a community or other residential treatment facility, or for a temporary pass. These relaxations of security hospital confinement provide an opportunity (and an incentive) for the committed person to demonstrate that he has mastered his sexual impulses and is ready to take his place in society. The patient can also petition for a full discharge. Minn.Stat. §§ 526.10 and 253B.18, subds. 5, 6, 7 & 15 (1992). De novo judicial review of the commissioner's decision is provided. Minn.Stat. § 253B.19 (1992). Further, committed persons have the right to an individualized written program plan; the right to periodic medical assessments; and the right to proper care and treatment, best adapted, according to contemporary professional standards, to rendering further confinement unnecessary. Minn.Stat. § 253B.03, subd. 7 (1992).

We do not read *Foucha* to prohibit Minnesota's commitment program for psychopathic personalities. In *Foucha* the confinement was for insanity and, when the insanity was shown to be in remission, the United States Supreme Court said Foucha had to be released.[13] Here, if there is a remission of Blodgett's sexual disorder, if his deviant sexual assaultive conduct is brought under control, he, too, is entitled to be released.[14] We conclude, therefore, that the psychopathic personality statute does not violate substantive due process.

## II.

■ Nor do we think the psychopathic personality statute violates equal protection

---

**11.** *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 301.70 (3d ed. rev. 1987) and the clinical criteria listed. *See also* the Final Report of the Minnesota Attorney General's Task Force on the Prevention of Sexual Violence against Women (Feb. 1989) at 30.

**12.** *See, e.g.,* Barbara K. Schwartz, Ph.D., *Effective Treatment Techniques for Sex Offenders,* Psychiatric Annals, Vol. 22:6 (June 1992) at 319: "While popular opinion may continue to be 'nothing works,' thousands of professionals are exploring 'what works.'" As the author points out, therapists are working with behavioral reconditioning, cognitive-behavioral techniques, family systems approaches, and the addictive model. *See also* Harry L. Kozol, Richard J. Boucher, & Ralph F. Garafalo, *The Diagnosis and Treatment of Dangerousness,* 18 Crime and Delinquency 371, 381 (1972).

**13.** Foucha's criminal act was aggravated burglary and illegal discharge of a firearm. After Foucha regained his sanity, Louisiana sought to continue his confinement because he had been involved in several altercations while institutionalized, indicative of an antisocial personality, and the doctor said that he would not "feel comfortable" in certifying Foucha as nondangerous. *Foucha,* —— U.S. at ——–——, 112 S.Ct. at 1782–83. Foucha, of course, would not be committable under our psychopathic personality statute.

**14.** Charles Pearson, the appellant in *State ex rel. Pearson v. Probate Court of Ramsey County,* 205 Minn. 545, 287 N.W. 297 (1939), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940), was, interestingly enough, released within the year after the United States Supreme Court affirmance of his commitment. *See* Dr. William D. Erickson, *The Psychopathic Personality Statute; Need for Change* 10 (1991) (unpublished paper presented by the Commissioner of Human Services to the legislature in 1991, appellant's appendix at 38).

under either the federal or state constitution. Because the fundamental right of liberty is involved, we assume the United States Supreme Court would require a heightened degree of scrutiny for federal equal protection analysis. And we think no less is required under our state constitution. *See State v. Russell,* 477 N.W.2d 886, 889 (Minn.1991), and also at 895 (Simonett, J., concurring opinion); and *Mitchell v. Steffen,* 504 N.W.2d 198, 210 (Minn.1993) (Tomljanovich, J., dissenting opinion), *pet. for cert. filed* 62 U.S.L.W. 3350 (1993).

Blodgett's equal protection argument is obscure, but he apparently claims it is a denial of equal protection to deny sexual predators their liberty when others who may be dangerous but not recognized medically as mentally ill retain their personal freedom. This, however, is simply a variation of Blodgett's substantive due process argument, and the argument ignores the fact that the sexual predator poses a danger that is unlike any other.[15] Amicus argues that it is unequal treatment to commit the psychopathic personality but not other criminal recidivist types, such as potential murderers and arsonists. But again, *Pearson* delineates genuine and substantial distinctions which define a class that victimizes women and children in a particular manner. *See Bailey v. Gardebring,* 940 F.2d 1150, 1153 (8th Cir.1991) (also rejecting the equal protection claim).

### III.

In this case the trial judge's findings of fact follow the statutory language of Minn. Stat. § 526.09–.10. The findings should have referred to the restrictive construction given the statute in *Pearson.* It appears, however, that *Pearson* was repeatedly referred to during the court hearings and that the trial judge had *Pearson* in mind in making his decision. We agree with the court of appeals' opinion which construes the trial court's findings in view of the evidence to accord with *Pearson,* and, therefore, we see no need for a remand for further findings.

We think, however, the legislature might well consider amending the statute to incorporate the *Pearson* construction.

■ Although this is not a proceeding where a committed person is seeking a discharge from commitment, we believe, in such a case, that the burden of proof should be on the state to show by clear and convincing evidence that commitment should continue. In such a proceeding the committed persons should have legal representation, just as at an initial commitment proceeding.

Most sexual offenders will be released upon completion of their prison terms. It is only the predator that is subject to Minn. Stat. § 526.10. If the state were to be denied the ability to hospitalize the predator, then, rather than let the offender out on the street, the state will counter by increasing the length of the prison sentence. Minnesota has already taken this step by enacting a patterned sex offender statute. In *State v. Christie,* 506 N.W.2d 293 (Minn.1993), this court upheld the constitutionality of this statute where sentences are increased solely because the sex offender is dangerous and likely to attack sexually again. Arguably, then, the question is not whether the sexual predator can be confined, but where. Should it be in prison or in a security hospital?

Or to put it another way: Is it better for a person with an uncontrollable sex drive to be given an enhanced prison sentence or to be committed civilly? The State of Washington, with a somewhat different program, has opted for the second alternative. *See In re Young,* 122 Wash.2d 1, 857 P.2d 989 (1993) (upholding constitutionality of sexually violent predator commitments under state's Community Protection Act). For the legislature which must provide the necessary prison cells or hospital beds, there are no easy answers. Nor are there easy answers for society which, ultimately, must decide to what extent criminal blame is to be assigned to people who are what they are.

---

**15.** Blodgett seems to argue also that the likelihood of a psychopathic personality's conduct being dangerous is less predictable than for a mentally ill person. There is no merit to this argument. As *Foucha* notes, the opinions of mental health experts are sufficiently reliable to support commitment proceedings. *Foucha,* —— U.S. at —— n. 3, 112 S.Ct. at 1783 n. 3. *See also State v. Christie,* 506 N.W.2d 293 (Minn.1993).

At issue is the safety of the public on the one hand and, on the other, the liberty interests of the individual who acts destructively for reasons not fully understood by our medical, biological and social sciences. In the final analysis, it is the moral credibility of the criminal justice system that is at stake.[16]

In the present imperfect state of scientific knowledge, where there are no definitive answers, it would seem a state legislature should be allowed, constitutionally, to choose either or both alternatives for dealing with the sexual predator. At the very least, we should follow *Pearson* until the United States Supreme Court says otherwise.

Affirmed.

WAHL, J., dissents and files opinion, in which KEITH, C.J., and TOMLJANOVICH, J., join.

WAHL, Justice (dissenting).

I respectfully dissent.

The Minnesota Psychopathic Personality Statutes, Minn.Stat. §§ 526.09–.10, under which a person, who may in the future commit acts of sexual misconduct dangerous to others, may be involuntarily committed, without the requirement of a finding that the person suffers from a medically diagnosable and treatable mental illness, to a confinement of indefinite duration until the person proves he is no longer dangerous to the public and no longer in need of inpatient treatment, in my view, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution. Furthermore, the rigor and methodical efficiency with which the Psychopathic Personality Statute is presently being enforced is creating a system of wholesale preventive detention, a concept foreign to our jurisprudence.[1]

---

**16.** The concern with enhanced criminal punishment on the basis of dangerousness is that the punishment may tend to become divorced from moral blameworthiness, thus adversely affecting the criminal justice system's credibility, which largely rests on a sense of blameworthiness. *See* Paul H. Robinson, *Foreword: The Criminal–Civil Distinction and Dangerous Blameless Offenders*, 83 J.Crim.L. & Criminology, No. 4, 693 at 716 (1993). Professor Robinson argues "that it would be better to expand civil commitment to include seriously dangerous offenders who are excluded from criminal liability as blameless for any reason, than to divert the criminal justice system from its traditional requirement of moral blame." *Id.*

**1.** According to Dr. William Erickson, Acting Medical Director of the Minnesota Security Hospital in 1991, thirteen men were committed to the security hospital under the psychopathic personality statute during the 1970s; thirteen men were committed during the 1980s; but that ten men have been committed in 1990 and the first half of 1991. *See* Dr. William D. Erickson, The Psychopathic Personality Statute, Need for Change 2 (1991), [hereinafter, Erickson] (unpublished paper presented by the Commissioner of Human Services to the legislature in 1991, appellant's appendix at 38).

Since 1991, our correctional institutions have been using Institution Procedures for Identification, Monitoring and Release of Public Risk Monitoring Cases which are designed, as the majority opinion notes at F1,

to create a uniform screening process and criteria to be used by institution program review teams for the identification of offenders already in or entering the corrections system whose behaviors prior to commitment or related to the offender's committing offense or during incarceration indicate that the offender is a candidate for civil commitment as a psychopathic personality or may represent a risk to the public upon release.

Frank W. Wood, Risk Assessment and Release Procedures for Violent Offenders/Sexual Psychopaths (1991).

The introduction to the Procedures gives the statutory definition of "psychopathic personality" then provides that "all person offenders" currently in the system and any other property offenders whose cases contain documented evidence of behaviors which represent a significant risk to the public will be screened on the offenders' annual review dates utilizing the Residential Placement/Special Release Programming Guidelines and the *alerting risk factors* to determine the level of public risk they represent upon release. Priority is placed on reviewing those cases in their last year of confinement to ensure no offender is released without such a determination.

All new commitments in the above-listed categories will be screened in the same way. Utilizing the guidelines, the institution program review teams will determine whether the inmate should be classified as a *Public Risk Monitoring Case.*

All inmates identified as Public Risk Monitoring Cases will be reviewed by the program review team and appropriate institution psychology staff to determine whether there is sufficient evidence from the committing offense and/or other documented behavior to make appropriate a referral for a civil commitment as mentally ill and dangerous or as a psychopathic personality. If there is sufficient evidence, the institution staff prepares the case for review and refers it to the department's Civil Commitment Review Team.

I do not deny that we must aggressively confront the danger posed by predatory sex offenders nor do I doubt the good faith of the efforts we have made to do so thus far. I only say the search for a solution and a statute that comports with the dictates of substantive due process is not at an end and that the public interest might be better served if the legislature turned its energies to that task rather than to appropriating millions of dollars for a prison to hold indefinitely persons committed as psychopathic personalities.

Since the legislature, in response to the report of the Governor's Committee on the Care of Insane Criminals and Sex Crimes,[2] passed the first Psychopathic Personality Statute in 1939, the definition of the term "psychopathic personality" has remained essentially unchanged:

> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with respect to sexual matters and thereby dangerous to other persons.

Minn.Stat. § 526.09 (1992). Shortly after its passage, however, this court narrowed the statute to apply only to

> those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.

*State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 555, 287 N.W. 297, 302 (1939) *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). The United States Supreme Court affirmed the statute as construed. Neither the Minnesota Supreme Court nor the United States Supreme Court addressed issues of substantive due process.

After *Pearson* had affirmed the constitutionality of the Minnesota Psychopathic Personality Statute, a number of other states passed similar statutes. Since 1959, however, half of the states that had sexual psychopath statutes have repealed them. Gary Gleb, Comment, *Washington's Sexually Violent Predator Law: The Need to Bar Unreliable Psychiatric Predictions of Dangerousness from Civil Commitment Proceedings*, 39 UCLA L.Rev. 213, 215 (1991).[3] Minnesota is one of thirteen jurisdictions which retain such laws,[4] despite outspoken criticism of

The department's Civil Commitment Review Team will review the case for referral to the appropriate county of commitment. If in their judgment the case is appropriate for a civil commitment, a member of the team will be designated to assist the institution in taking the case through the civil commitment process.

2. Report of the Governor's Committee on the Care of Insane Criminals and Sex Crimes, Journal of the House of the Fifty–First Session of the Legislature of the State of Minnesota, at 1394 (1939), on which the statute was based, recommended a "change in present laws relating to the care of defectives dangerous to the public *to make possible the control of dangerously psychopathic persons without having to wait for them to commit a shocking crime.*" (Emphasis added.) Thus "control" rather than "treatment" was the original purpose of the statute. The Committee recognized the "necessarily vague and uncertain difference between criminal acts and behavior that is offensive only in light of certain standards or morality * * *" and acknowledged that "[f]ormal control of behavior in this field becomes, therefore, exceedingly difficult both from

the standpoint of legislation and law enforcement." *Id.*

3. In 1959, 26 states and the District of Columbia had statutes providing for the commitment of psychopathic sex offenders: Alabama, California, Colorado, District of Columbia, Florida, Illinois, Indiana, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, Wisconsin, and Wyoming. *See* Alan H. Swanson, Comment, *Sexual Psychopath Statutes: Summary and Analysis*, 51 J.Crim.L. & Criminology 215 app. at 228–35 (1960–61).

4. In 1990, the following 12 states and the District of Columbia had sexual psychopath statutes: Colorado, Connecticut, Illinois, Massachusetts, Minnesota, Nebraska, New Jersey, Oregon, Tennessee, Utah, Virginia, Washington. Gleb, *supra*, at 215 n. 22. It appears that only Minnesota and the District of Columbia require that persons committed under those statutes be confined within the mental health system rather than in corrections. Erickson, *supra* note 1, at 12.

those laws by commentators.[5] *See, e.g.*, Donald B. Gould & Irving L. Hurwitz, Note, *Out of Tune with the Times; The Massachusetts SDP Statute,* 45 B.U.L.Rev. 391 (1965); Michael B. Roche, Note, *The Plight of the Sexual Psychopath: A Legislative Blunder and Judicial Acquiescence,* 41 Notre Dame Lawyer 527 (1966); Joseph F. Grabowski V, Comment, *The Illinois Sexually Dangerous Persons Act: An Examination of a Statute in Need of Change,* 12 S.Ill.U.L.J. 437 (1988); C. Peter Erlinder, *Minnesota's Gulag: Involuntary Treatment for the "Politically Ill,"* 19 Wm. Mitchell L.Rev. 99 (1993). It is troubling that since the Minnesota statute went into effect in 1939, it has been arbitrarily and inconsistently enforced despite the limiting construction in *Pearson.*[6] It is also troubling, as noted earlier, that in recent years the statute, infrequently invoked for many years, has come to be used increasingly to insure the detention of dangerous sex offenders who have not been adequately controlled under determinant sentencing.

In the more than half a century since its holding in *Pearson,* the United States Supreme Court has decided a number of cases involving a state's power to confine individuals without a criminal conviction. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (commitment for mental retardation); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (commitment for mental illness); *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (pretrial commitment of incompetent criminal defendants).

Appellant argues that many of these civil commitment cases, including most recently, *Foucha v. Louisiana,* —— U.S. ——, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), render Minn.Stat. §§ 526.09–.10 unconstitutional on their face and as applied to him. While the psychopathic personality statutes comes to us with a presumption of continuing constitutional validity, *In re Haggerty,* 448 N.W.2d 363, 364 (Minn.1989), we are not free to disregard the dictates of the United States Supreme Court when reviewing state legislation challenged as violative of the Fourteenth Amendment. *Minnesota v. Clover Leaf Creamery,* 449 U.S. 456, 461 n. 6, 101 S.Ct. 715, 722 n. 6, 66 L.Ed.2d 659 (1981). The law set out in *Foucha,* applied to appellant's case, compels the conclusion that the Minnesota Psychopathic Personality Statutes, Minn. Stat. §§ 526.09–.10 are violative of the Fourteenth Amendment and, therefore, unconstitutional.

In *Foucha,* the United States Supreme Court held that a Louisiana civil commitment statute that allowed a person acquitted by reason of insanity, who had an antisocial personality disorder but no longer had a mental illness, to remain indefinitely committed to a mental institution on the basis of dangerousness alone violated due process. —— U.S. at ——, 112 S.Ct. at 1787. Terry Foucha, charged by Louisiana authorities with aggravated burglary and illegal discharge of a firearm, was found not guilty by reason of insanity and committed to a mental institution. *Id.* at 1782. Four years later a review panel at the institution, convened to

---

**5.** Commentators have noted that

> "growing awareness that there is no specific group of individuals who can be labeled sexual psychopaths by acceptable medical standards and that there are no proven treatments for such offenders has lead such professional groups as the Group for the Advancement of Psychiatry, the President's Commission on Mental Health, and most recently, the American Bar Association Committee on Criminal Justice Mental Health Standards to urge that these laws be repealed."

Samuel J. Brakel, John Parry, and Barbara A. Weiner, *The Mentally Disabled and the Law,* (3rd Ed.1985) 743.

**6.** According to Dr. William D. Erickson, Medical Director of the St. Peter Regional Treatment/Minnesota Security Hospital, persons have been committed as psychopathic personalities for a very wide range of behaviors, including window peeping, excessive masturbation, "sexual contact with cows," homosexuality, incest, pedophilia, and rape. Erickson, *supra* note 1, at 20–26. Furthermore, many courts in subsequent cases have not followed the narrow judicial definition of "psychopathic personality" adopted in *Pearson* but have used instead the statutory definition as written. *See, e.g., Dittrich v. Brown County,* 215 Minn. 234, 235, 9 N.W.2d 510, 511 (1943); *In re Martenies,* 350 N.W.2d 470, 472 (Minn.Ct.App.1984); *In re Stone,* 376 N.W.2d 511, 513 (Minn.Ct.App.1985); *In re Brown,* 414 N.W.2d 800, 803 (Minn.Ct.App.1987); *In re Clements,* 440 N.W.2d 133, 136 (Minn.Ct.App. 1989); *In re Monson,* 478 N.W.2d 785, 788–89 (Minn.Ct.App.1991).

determine Foucha's mental condition and whether he could be released without danger to himself or others, found no evidence of mental illness since admission and recommended conditional discharge.

At the hearing required to determine dangerousness, the trial court received (1) the report of the two-member sanity commission that Foucha "is presently in remission from mental illness [but] [w]e cannot certify that he would not constitute a menace to himself or others if released," and (2) the testimony of one of the doctors on the commission, who had also conducted the pretrial examination, that Foucha had recovered from a temporary drug-induced psychosis and was in "good shape" mentally but had "an antisocial personality, a condition that is not a mental disease and that is untreatable." *Id.* On the basis of several altercations in which Foucha had been involved at the institution, the doctor testified he would not feel comfortable certifying that Foucha would not be a danger to himself or other people. *Id.* — U.S. at — – —, 112 S.Ct. at 1782–83. The trial court determined that Foucha was dangerous to himself and others and ordered him returned to the mental institution. The state court of appeals refused supervisory writs. The Louisiana Supreme Court affirmed, holding that the statutory provision permitting confinement of an insanity acquittee based on dangerousness alone did not violate the Due Process Clause nor the Equal Protection Clause. The United States Supreme Court granted certiorari. *Id.*

The Court noted at the outset of its substantive due process analysis that the State was no longer entitled to hold Foucha in a psychiatric facility as an insanity acquittee because when he regained his sanity, that basis for holding him had disappeared.[7] *Foucha,* — U.S. at — , 112 S.Ct. at 1784.

Nor, in the Court's view, should Foucha be held as a mentally ill person because he was not suffering from a mental disease or illness and "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* — U.S. at —, 112 S.Ct. at 1785; *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). The State, the Court said, sought to perpetuate Foucha's confinement on the basis of his antisocial personality which, as evidenced by his conduct at the facility, the trial court found rendered him a danger to himself or others. — U.S. at —, 112 S.Ct. at 1784. This basis the Court found fraught not only with difficulties but unconstitutional. "[T]he Due Process Clause," the Court stated, "contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the proceedings used to implement them." *Id.* — U.S. at —, 112 S.Ct. at 1785 (quoting *Zinermen v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action." *Foucha,* — U.S. at —, 112 S.Ct. at 1785; *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). "[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones,* 463 U.S. at 361, 103 S.Ct. at 3048. The Court recognized that by indefinitely committing Foucha to a mental institution on the basis of dangerousness alone, the State was depriving him of a fundamental right, and, without articulating the strict scrutiny standard, the Court looked for the existence of a compelling governmental interest to justify that deprivation.[8]

---

**7.** "[T]he Constitution permits the government on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones v. United States,* 463 U.S. 354, 368, 370, 103 S.Ct. 3043, 3053, 77 L.Ed.2d 694 (1983).

**8.** Deprivation or infringement of a fundamental right triggers strict scrutiny by a reviewing court, a level of scrutiny which requires the state to

prove the existence of a "compelling governmental interest" and to demonstrate that no alternative means are available that involve a lesser deprivation of liberty. *See, e.g., Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973); James W. Ellis, Limits on the State's Power to Confine "Dangerous" Persons: Constitutional Implications of *Foucha v. Louisiana,* 15 U. Puget Sound L.Rev. 635, 644 (1992).

The *Foucha* Court identified three categories of confinement in which a state, pursuant to its police power, may constitutionally deprive an individual of his or her liberty. *Id.* —— U.S. at ——--——, 112 S.Ct. at 1785–86. First, the state may imprison convicted criminals for purposes of deterrence and retribution, though there are constitutional limitations on the conduct that a state may criminalize. *Id.* Second, the state may confine persons shown by clear and convincing evidence to be mentally ill and dangerous. *Id.* —— U.S. at ——, 112 S.Ct. at 1786. Third, in "certain narrow circumstances persons who pose a danger to others or to the community may be subject to limited confinement * * *." *Id.* As an example of the limits placed on this third category, the Court cited *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), a decision in which the Court found freedom from physical confinement to be a fundamental right, but also found the state's "interest in preventing crime by arrestees [to be] both legitimate and compelling." *Id.* at 749, 107 S.Ct. at 2103. In *Salerno*, the Court found constitutionally permissible a statute that permitted pre-trial detention of dangerous arrestees where its use was limited to circumstances involving only the most serious of crimes, where the government had to demonstrate probable cause and prove by clear and convincing evidence at an adversarial hearing that no conditions of release could reasonably assure the safety of the community, and where the duration of detention was strictly limited by the Speedy Trial Act. *Foucha,* —— U.S. at ——, 112 U.S. at 1786.

The *Foucha* court found that the Louisiana statute did not fall within any of these constitutionally-acceptable reasons for involuntary confinement because the appellant had not been convicted, because the state did not assert that the appellant was mentally ill, and because the statute was not sufficiently narrow. —— U.S. at ——--——, 112 S.Ct. at 1786–87. To accept the State's rationale that Foucha may be held indefinitely because he once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, the Court said, "would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct." *Id.* —— U.S. at ——, 112 S.Ct. at 1787. The Court held the Louisiana statute permitting the indefinite detention of insanity acquittees who are not mentally ill and do not prove they would not be dangerous to others not to be "one of those carefully limited exceptions permitted by the Due Process Clause." *Id.*

Examination of the Minnesota Psychopathic Personality Statutes in the substantive due process light of *Foucha,* starts by recognizing the fundamental nature of a person's right to be free from bodily restraint. That right "has always been at the core of the liberty protected by the Due Process Clause" which "contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the proceedings used to implement them." *Foucha,* —— U.S. at ——, 112 S.Ct. at 1785. The state's commitment of Blodgett as a psychopathic personality deprives him of the fundamental right to be free from physical confinement. Deprivation or infringement of a fundamental right requires the state to prove the existence of a compelling governmental interest in continuing that confinement and to demonstrate that no alternative means are available that involve a lesser deprivation of liberty. *See supra* note 8.

*Foucha* has set out the limited circumstances under which the state may constitutionally defeat an individual's interest in physical liberty. Minnesota Statutes §§ 526.09–.10, like the Louisiana statute, fail to fall within those constitutional limits. First, commitment as a psychopathic personality under the statute is not a criminal conviction for which an individual can be imprisoned. Appellant was convicted of two counts of criminal sexual conduct and only after he had served his sentence for those crimes was he committed under section 526.09, with his three prior felony convictions being used to establish the habitual course of misconduct in "sexual matters" on which the commitment was based. Second, like Foucha, Blodgett is not mentally ill, but suffers from an antisocial personality disorder for which, as the *Foucha*

Court recognized, there is no effective treatment. Thus, if the state is to have a constitutionally valid basis for Blodgett's confinement, it must be one of those "carefully limited exceptions permitted by the Due Process Clause" where "in certain narrow circumstances persons who pose a danger to others or to the community may be subject to limited confinement * * *." *Foucha,* —— U.S. at ——, 112 S.Ct. at 1786.

In *Salerno,* the United States Supreme Court found such an exception and upheld the constitutionality of the Federal Bail Reform Act of 1984, which provided for pretrial detention of certain defendants found likely to commit dangerous crimes while awaiting trial. *Salerno* did not save Louisiana's scheme of confinement in *Foucha,* however, and it will not save Minn.Stat. §§ 526.09–.10. While section 526.09 is narrowly focused on a particularly acute problem in which the government interests are overwhelming, i.e., violent sexual assaults, and seeks to confine those who are habitual and dangerous sex offenders, the statute does not provide for a confinement that is strictly limited in duration or, for that matter, limited in duration at all. The duration of the confinement must bear some reasonable relation to the purpose for which the individual is committed. *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).

The *Salerno* court emphasized that the detention there found to be constitutionally permissible for pre-trial detainees was strictly limited in duration by the stringent time limitations of the Speedy Trial Act. 481 U.S. at 747, 107 S.Ct. at 2101. While the constitutionally permissible duration of confinement of persons committed as mentally ill and dangerous may be longer than that of pre-trial detainees, the duration of that confinement is limited by the reasonable possibility under Minn.Stat. § 253B.18, subd. 15 (1992), that such persons may respond to treatment and be released. In contrast, once Blodgett is involuntarily committed as a psychopathic personality, which does not require a finding

that he is suffering from a medically diagnosable and treatable mental illness, he may be confined indefinitely until he shows to the satisfaction of the commission and the special review board that he "is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision." Minn. Stat. § 253B.18, subd. 15. The burden of proof has now shifted to Blodgett. It is questionable whether he can show he is no longer in need of "inpatient treatment and supervision" when the very psychiatrists who are charged with treating him say there is no treatment for an antisocial personality disorder and that any "treatment" he could receive at the security hospital would be "sham" or "placebo" treatment with "no evidence at the end of spending time in these groups that he would be less or more likely to commit the same crime."

Furthermore, how can Blodgett, or any person committed under the psychopathic personality statute, show he is "no longer dangerous to the public," when, if the *Pearson* standard has been followed, it has already been established that he has an utter lack of power to control his sexual impulses as evidenced by a habitual course of misconduct in sexual matters which makes it likely that he will inflict injury, loss, pain or other evil on the object of his uncontrolled and uncontrollable desire and when the lack of any recent overt acts may well be explained by the control under which he has been placed at the security hospital? The statute thus has the effect of "substituting confinement for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law." *Foucha,* —— U.S. at ——, 112 S.Ct. at 1787.

The state argues forcefully that the Psychopathic Personality Statutes serve the state's compelling interest under its police power to protect the public from dangerous sexual offenders,[9] *Jones v. United States,* 463

---

9. In *In re Young,* 122 Wash.2d 1, 857 P.2d 989 (1993), the Supreme Court of Washington has held constitutional the sexually violent predator provisions of Washington's Community Protec-

tion Act of 1990. Under the statutory scheme there at issue, in order to commit as a sexually violent predator a person who has been convicted of or charged with a crime of sexual violence,

U.S. 354, 366, 368, 103 S.Ct. 3043, 3051–52, 77 L.Ed.2d 694 (1983), and the state's legitimate interest under its *parens patriae* power to provide treatment to its citizens who are unable because of mental disorders to help themselves. The state points to three commitment statutes, in addition to sections 526.-09–.10, under which, in the exercise of its police and *parens patriae* powers, it may civilly commit persons without a finding of mental illness. Minn.Stat. § 253B.02, subd. 14 (1992) (mentally retarded); Minn.Stat. § 253B.02, subd. 2 (1992) (chemically dependent); and Minn.Stat. § 144.4172, subd. 8 (1992) (health threat to others). These statutes, however, as the majority opinion fails to recognize, involve verifiable, well-defined, medically recognized and clinically valid conditions [10] in addition to requiring that the condition "pose a substantial risk of harm to self or others." (mental retardation and chemical dependency) or "place others at risk of * * * serious illness, serious disability or death." (health threat). And in each of these three conditions, the State's *parens patriae* interest in protecting the individual committed, as well as the public, is more compelling than it is in a psychopathic personality commitment. As to the duration of confinement, chemically dependent persons and mentally ill persons may not be committed for a period to exceed 12 months without the filing of a new petition. Minn.Stat. §§ 253B.13, subd. 3, 253B.12, subd. 1.

The state does have a compelling interest in protecting the public from violent sexual assaults but, absent mental illness or a criminal conviction, that interest can be constitutionally implemented only by observing the limitations set out in *Salerno*. Under section 526.10 there is no limitation on the duration of confinement. Given the difficulty, if not the impossibility, of the proof required for release under Minn.Stat. § 253B.18, subd. 15, of persons committed without a medically diagnosable and treatable mental illness, commitment under the Psychopathic Personality Statutes could result in a potential life sentence served in what amounts to preventive detention.

The state has not adequately explained why its police power interest cannot be vindicated by ordinary criminal processes involving charge and conviction, the use of enhanced sentences for recidivists,[11] and other constitutionally permissible means of dealing with patterns of criminal conduct. *See Foucha,* ——— U.S. at ——— – ———, 112 S.Ct. at 1786–87. Nor has the state shown that confinement of psychopathic personalities is even rationally related to the asserted purpose of treatment as required by *Jackson,* 406 U.S. at 738, 92 S.Ct. at 1858. ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.") Appellant does not suffer from a medically recognized mental illness; he has a personality disorder for which, at least at this point, there appears to be no treatment available.[12] The Minnesota Psychopathic Personality Statutes, Minn. Stat. §§ 526.09–.10, under which a person

---

the state must prove beyond a reasonable doubt that the person "suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence." *Id.* 857 P.2d at 993. According to the Washington Supreme Court, the statute "falls comfortably within the 'civil commitment' category discussed in *Foucha* because *the state must prove both a mental illness and dangerousness." Young,* 857 P.2d at 1007. (Emphasis added). The Court reads "antisocial personality disorder," as opposed to antisocial personality behavior, into the definition of mental illness and also requires that an allegation of a recent overt act be included in sex predator petitions for non-incarcerated individuals. *Id.* at 1006–1009. Either party or the court may request a jury trial. *Id.* at 993. While *Young* is instructive, it is not controlling in the case before us.

10. The terms "psychopathic personality" and "sexual psychopath" are not clinically valid. Group for Advancement of Psychiatry, *Psychiatry and Sexual Psychopath Legislation: The 30's to the 80's* 840–41 (1977).

11. This court has found constitutional the patterned sex offender statute, Minn.Stat. § 609.-1352 (1990), which provides for enhanced sentences, *State v. Christie,* 506 N.W.2d 293 (Minn. 1993).

12. One commentator has noted that "[h]ospitalization and medical treatment cannot cure a legislatively created category." C. Peter Erlinder, *Minnesota's Gulag: Involuntary Treatment for the "Politically Ill,"* 19 Wm. Mitchell L.Rev. 99, 133 (1993).

without a medically diagnosable and treatable mental illness who may in the future commit an act of sexual misconduct dangerous to others may be involuntarily committed to a confinement of indefinite duration is violative of substantive due process under the Fourteenth Amendment of the United States Constitution.

Appellant also argues that section 526.09 violates his Fourteenth Amendment right to Equal Protection because it creates a class of citizens, identified solely by legislatively defined behavior and deprives those citizens of the fundamental right to liberty, without either a criminal conviction or a finding that they suffer from a medically defined, clinically valid illness that requires hospitalization for reasons of safety to the individual or the public.[13] The Equal Protection Clause of the Fourteenth Amendment requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). In *Pearson,* the United States Supreme Court used a rational basis test to reject Pearson's equal protection argument, stating that "the legislature is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." 309 U.S. at 275, 60 S.Ct. at 526. Relying on *Pearson,* the court of appeals used the same analysis in this case. *In re Blodgett,* 490 N.W.2d at 645–46. It is questionable, however, in light of recent equal protection analysis, whether these cases employed the correct level of scrutiny.[14] While, as a general rule, legislation is presumed valid if the classification drawn by the statute is rationally related to a legitimate state interest, *City*

*of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254, that rule gives way when the statute impinges on a fundamental right protected by the constitution. Since the statutory classification here burdens the fundamental right to liberty, the Psychopathic Personality Statute can be upheld only if the state has a compelling interest, a "particularly convincing reason," for confining in a mental institution a class of people with psychopathic personalities when it does not confine other classes of people who have committed criminal acts and who cannot later prove that they are not dangerous. *Foucha,* —— U.S. at ——, 112 S.Ct. at 1788. As discussed above, the state's asserted interests—protection of citizens under its police power and treatment of psychopathic personalities under its *parens patriae* power—do not meet this standard.

The release standards applicable under the psychopathic personality statute also implicate the Equal Protection Clause. The discharge provisions of Minn.Stat. § 253B.18, subd. 15, applicable both to persons committed as mentally ill and dangerous and to persons committed as psychopathic personalities, require proof that the person seeking release "is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision." Because mental illness is medically diagnosable and treatable, the person committed as mentally ill and dangerous has a reasonable opportunity for release by showing he has been treated and that his mental illness is in remission or under control, rendering him no longer dangerous to the public. The person committed as a psychopathic personality, as a practical matter, has no such opportunity.[15]

---

13. Appellant also claims he has been denied equal protection under the Minnesota Constitution, art. I, § 2, but did not develop this claim in the courts below. Thus, while it is unlikely that the Minnesota Constitution requires less than heightened or strict scrutiny when a statute infringes on an individual's fundamental right to freedom from confinement, I would not reach the state constitutional issue at this time.

14. The United States Supreme Court recently declined to consider the question of whether heightened equal protection scrutiny should be applied to a certain statutory scheme involving civil commitment because the claim was not

properly presented. *Heller v. Doe,* —— U.S. ——, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). And Justice O'Connor, the deciding vote in *Foucha,* did not believe it necessary to reach equal protection issues in that case. *Foucha,* —— U.S. at ——, 112 S.Ct. at 1790 (Justice O'Connor, concurring in part and concurring in the judgment).

15. Dr. Erickson reports that of the 21 men in residence at the security hospital in mid–1991 under commitment as psychopathic personalities, only one was making reasonable progress in treatment, none were mentally ill and none were on psychotropic medication. Erickson, *supra* note 1, at 3. Of the 16 persons committed as

In *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the United States Supreme Court invalidated a statute that governed the commitment and release standards for criminal defendants who were found incompetent to stand trial. Under the statute, the standards for committing an incompetent defendant were more lenient and the standards for release were more stringent than those used for other civil commitments. *Id.* at 730, 92 S.Ct. at 1854. Addressing the equal protection challenge, the Court stated that "[t]he harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release." *Id.* at 729, 92 S.Ct. at 1854. The harm here is similar and similarly violative of the Equal Protection Clause.

Though we will declare no statute unconstitutional "if by any reasonable construction it can be given a meaning in harmony with the fundamental law," *State v. Oman,* 261 Minn. 10, 18, 110 N.W.2d 514, 520 (1960), statutes which permit the involuntary and indefinite confinement of a non-mentally ill, though potentially dangerous, individual suffering from an untreatable personality disorder cannot pass scrutiny. "Confinement based on what amounts to a propensity for dangerousness unrelated to mental illness and for which no treatment is required 'is nothing more than preventive detention, a concept foreign to our constitutional order.' " *Reome v. Levine,* 692 F.Supp. 1046, 1051 (D.Minn.1988). I would hold that the Minnesota Psychopathic Personality Statutes, Minn.Stat. §§ 526.09–.10, under which a person, who may in the future commit acts of sexual misconduct dangerous to others, may be involuntarily committed, without the requirement of a finding that the person suffers from a medically diagnosable and treatable mental illness, to a confinement of indefinite duration until the person proves he is no longer dangerous to the public and no longer in need of inpatient treatment violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution. I would reverse the judgment of the court of appeals.

KEITH, Chief Justice (dissenting).

I join the dissent of Justice Wahl.

TOMLJANOVICH, Justice (dissenting).

I join the dissent of Justice Wahl.

psychopathic personalities who had initially engaged in the Intensive Treatment Program for Sexual Aggressive (ITPSA) since its beginning in 1974, only three, all non-violent pedophiles, had completed the program and one of those had been reincarcerated. Erickson, *supra* note 1, at 19.