**In the Matter of Rodger Dean ROBB II.**

**No. C8–00–1367.**

Court of Appeals of Minnesota.

Feb. 1, 2001.

Review Denied April 17, 2001.

Gregory R. Solum, Edina, MN; and Warren J. Maas, Brooklyn Park, MN, for appellant.

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Carolyn A. Peterson, Assistant County Attorney, Minneapolis, MN, for respondent.

Considered and decided by PETERSON, Presiding Judge, LANSING and STONEBURNER, Judges.

## OPINION

PETERSON, Judge.

In this appeal from an indeterminate commitment as a sexual psychopathic personality and as a sexually dangerous person, appellant Rodger Dean Robb II challenges the sufficiency of the evidence to support his commitments and several evidentiary rulings. We affirm his commitment as a sexually dangerous person and reverse his commitment as a sexual psychopathic personality.

## FACTS

Robb admitted to sexual contact with several adolescent boys from approximately 1970 through 1981. According to the testimony of two victims, admissions by Robb, and police reports, Robb used his position as a band teacher in 1976 to molest several boys. The assaults involved Robb grabbing the boys' genitals and fondling them. In 1976, Robb was convicted of disorderly conduct for molesting a ten-year-old boy.

In 1979, Robb was charged with three counts of second-degree criminal sexual conduct for sexually molesting three boys on separate occasions. Robb again used his position as a band teacher to make unwanted sexual advances and touch the boys' genitals. In October 1979, Robb pleaded guilty to one count of second-degree criminal sexual conduct in exchange for dismissal of the other two counts. He was sentenced to not more than fifteen years, with execution of the sentence stayed on the condition that he enter and complete the Intensive Treatment Program for Sexual Aggressives ("ITPSA") at the State Security Hospital.

While Robb was a resident at the ITPSA in late 1980, he sexually molested a 15-year-old resident by fondling the boy's genitals while he was asleep. Robb also established relationships with several adolescent residents, which led the treatment staff to monitor him closely. In 1981, Robb fondled an adolescent resident, then

performed fellatio on him and masturbated him. As a result, he was terminated from the ITPSA program, his probation was revoked, and his 21–month sentence was executed. He was paroled from prison in April 1982.

In 1993, Robb was charged with one count of first-degree criminal sexual conduct and two counts of third-degree criminal sexual conduct for sexually assaulting three adolescent boys in 1992 and 1993. Robb pleaded guilty to all three counts and was sentenced to 98 months in prison.

In one of the 1993 incidents, Robb forced a 12–year–old boy onto Robb's bed, pulled down his pants, and masturbated him. Robb later masturbated the boy on ten to fifteen different occasions, performed fellatio on him four or five times, and had the boy masturbate him on three occasions. With three other victims, Robb created an environment in his apartment that was enticing to young boys. He gave the boys snacks, the street drug "rush", marijuana, or alcohol, and allowed them to play video games. On several different occasions, Robb masturbated the boys or performed fellatio on them. Robb showed some of the boys pornographic videos. During one incident, Robb pushed one of the victim's arms down, pinned his hands against his stomach, and performed fellatio on him. One of the boys reported that Robb used "mental manipulation" on them to get them to comply with Robb's requests. Robb often persisted in his sexual actions even after the boys told him to stop.

Robb initially admitted several of the allegations, but he often changed his statements and denied allegations he had previously admitted. Robb has an extensive treatment history, but he failed to complete any treatment program because he felt his issues as a homosexual were not being addressed. In addition, he consistently denied any wrongdoing and asserted that sex with minors was okay as long as the minor consented. His belief system made treatment of his sexual deviance extremely difficult.

In April 1999, a petition to commit Robb as a sexual psychopathic personality and as a sexually dangerous person was filed. The court appointed Dr. Harry M. Hoberman, a psychologist, as an examiner. At Robb's request, the court appointed Dr. Stephen A. Parker, a psychologist, as a second examiner. Both examiners testified at the commitment hearing. Two of the victims who were assaulted in 1976 testified. Hoberman testified that Robb met the criteria for commitment as a sexual psychopathic personality and as a sexually dangerous person. Parker testified that Robb fell just short of the requirements for commitment as a sexual psychopathic personality because he did not quite demonstrate an utter lack of power to control his sexual impulses. Parker testified that Robb met the criteria for commitment as a sexually dangerous person.

### ISSUES

1. Does Robb meet the statutory requirements for commitment as a sexual psychopathic personality and as a sexually dangerous person?

2. Was Robb committed to the least restrictive alternative treatment program?

3. Did the trial court make a prejudicial erroneous evidentiary ruling?

### ANALYSIS

*1. Sufficiency of the Evidence*

■ To commit a person as a sexual psychopathic personality or as a sexually dangerous person the statutory requirements for commitment must be proved by clear and convincing evidence. Minn.Stat. § 253B.18, subd. 1 (Supp.1999); *see* Minn. Stat. § 253B.185, subd. 1 (Supp.1999) (provisions of section 253B.18 apply to commitments as sexual psychopathic personality and sexually dangerous person).

When evidence as to the existence of a psychopathic personality is in conflict,

the question is one of fact to be determined by the trial court upon all the evidence.

*In re Martenies*, 350 N.W.2d 470, 472 (Minn.App.1984) (citation omitted), *review denied* (Minn. Sept. 12, 1984). The trial court's findings of fact will not be reversed unless clearly erroneous. *In re Monson*, 478 N.W.2d 785, 788 (Minn.App.1991).

Citing *In re Blodgett*, 510 N.W.2d 910 (Minn.1994), and *In re Rickmyer*, 519 N.W.2d 188 (Minn.1994), Robb argues that the trial court erred when it committed him as a sexual psychopathic personality and as a sexually dangerous person because neither the trial court record nor his history of sex offenses includes a single instance of violent sexual behavior. He contends that his nonviolent behavior does not make him dangerous to others as required by the sexual-psychopathic-personality statute, and fails to establish the likelihood that he will engage in acts of future harmful sexual conduct required by the sexually dangerous person statute.

A. *Sexual–Psychopathic–Personality Commitment*

In 1939, the psychopathic-personality statute was challenged on the grounds that it was unconstitutionally vague. *State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 287 N.W. 297 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). In response to the vagueness challenge, the Minnesota Supreme Court construed the statutory definition of psychopathic personality to apply only to

those persons who by a habitual course of misconduct in sexual matters have evidenced an utter lack of power to control their sexual impulses and who as a result are likely to attack or otherwise inflict injury, loss, pain, or other evil on

the objects of their uncontrolled and uncontrollable desire.

*Id.* at 555, 287 N.W. at 302.

In 1994, the legislature amended the psychopathic-personality statute. 1994 Minn. Laws 1st Spec. Sess. ch. 1, art. 1, §§ 2, 6. The amendment changed the defined term from "psychopathic personality" to "sexual psychopathic personality" and explicitly incorporated into the statutory definition the construction given the statute by the supreme court in *Pearson* that the person has, by a habitual course of misconduct in sexual matters, evidenced an utter lack of power to control the person's sexual impulses.

The amended statute states:

"Sexual psychopathic personality" means the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, *is dangerous to other persons.*[1]

Minn.Stat. § 253B.02, subd. 18b (1998) (emphasis added).

Earlier in 1994, before the legislature amended the psychopathic-personality statute, the supreme court released the *Blodgett* and *Rickmyer* opinions relied on by Robb. In these opinions, the supreme court explained the meaning of the psychopathic-personality statute and described the behavior that is encompassed by the statutory definition. Because the psychopathic-personality statute that the supreme court interpreted in *Blodgett*, as it had been construed in *Pearson*, was not substantively changed when the legislature

---

1. Minn.Stat. § 526.09 (1992), the statute that was in effect before the legislature acted in

1994, also required that the person is "dangerous to other persons."

enacted the sexual-psychopathic-personality statute in 1994, the court's explanation of the psychopathic-personality statute also interprets the sexual-psychopathic-personality statute.

The supreme court described Blodgett's behavior as follows:

> Blodgett broke into the home of the parents of his ex-girlfriend, entered the room where his ex-girlfriend was sleeping, and sexually assaulted her. * * * * * * Blodgett sexually assaulted a woman in the parking lot of a supermarket while attempting to steal her car. Blodgett grabbed the woman, pushed her into the front seat, shoved his hand in her mouth, hit her on the side of the head, put his hand between her legs and squeezed and rubbed her genital area. When the woman resisted and screamed for help, Blodgett asked her, "Do you want to die?" Five weeks later, * * * Blodgett raped a 16–year–old girl both vaginally and anally.

*Blodgett,* 510 N.W.2d at 911.

The court stated that in the context of a psychopathic-personality commitment,

> the compelling government interest is the protection of members of the public from persons who have an uncontrollable impulse to sexually assault.

*Id.* at 914. The court then concluded that

> In this case it has been clearly and convincingly established that Blodgett is dangerous, and that there is a substantial likelihood that he will sexually assault again, as he has in the past.

*Id.*

> The supreme court explained that
>
> [t]he psychopathic personality statute identifies a volitional dysfunction which grossly impairs judgment and behavior with respect to the sex drive. *Compare* Minn.Stat. Sec. 253B.02, subd. 13 (1992) (defining mental illness). The psychopathic personality is sometimes equated with the medically recognized "anti-social personality disorder"; it is, however, limited to sexual assaultive behavior and

excludes mere sexual promiscuity. It also excludes other forms of social delinquency. Whatever the explanation or label, the "psychopathic personality" is an identifiable and documentable violent sexually deviant condition or disorder.

*Id.* at 915 (footnotes omitted). The court further explained that, to determine whether a person is dangerous to others, the court considers, among other things, "the nature and frequency of the sexual assaults" and "the degree of violence involved." *Id.*

Robb cites these statements as authority for his argument that he cannot be committed as a sexual psychopathic personality because his history of sexual offenses does not include a single instance of violent sexual behavior. He contends that under *Blodgett,* to be dangerous to other persons as required by the sexual-psychopathic-personality statute, a sex offender's behavior must include violent sexual assaults.

▮ The supreme court's explanation of the psychopathic-personality statute in *Blodgett* plainly indicates that to fall within the statutory definition of psychopathic personality, a person must have a violent sexually deviant condition or disorder and the person's behavior must be sexual assaultive behavior. The court explicitly stated that the definition "excludes mere sexual promiscuity." *Id.* And just as plainly, the supreme court's explanation of its conclusion that Blodgett is dangerous is based on the fact that Blodgett's past behavior was not just sexual behavior; it included sexual assaults and demonstrated that there is a substantial likelihood that he will sexually assault again. Consequently, we conclude that under *Blodgett,* to demonstrate that a person is dangerous to other persons as required by the sexual-psychopathic-personality statute, it must be shown that the person is likely to commit violent sexual assaults.

However, a wide range of conduct can be described as violent sexual assaults. In *Rickmyer,* the supreme court held that not

every course of sexual assaults is sufficient to demonstrate that a person is dangerous to other persons as required by the psychopathic-personality statute and further explained what kind of behavior meets the requirements of the statute. 519 N.W.2d at 189–90.

Rickmyer's behavior led to several convictions for sexual contact with young boys. *Id.* at 189. In 1981, he pleaded guilty to two counts of simple assault. *Id.* In 1989, he pleaded guilty to "indecent exposure, having exposed his erect penis to some boys in a motel room," and to fifth-degree assault after "spanking a young boy on the buttocks." *Id.* Additional spanking incidents occurred as late as 1991. *Id.* Police reports that were received into evidence indicated that Rickmyer "had twice fondled the buttocks of an 8–year–old boy at a public playground," that a 10–year–old boy reported that Rickmyer "had touched his private parts 'a lot of times' and put his hands inside the boy's underwear and squeezed his buttocks," and that another child stated that Rickmyer "had tried to touch his buttocks and had spanked 'a lot' of kids at the playground." *Id.*

The trial court committed Rickmyer as a psychopathic personality based in part on the court's finding that

> [t]here is a substantial likelihood that [Rickmyer] will further engage in acts of a sexual nature capable of inflicting serious physical or mental harm to others.

*Id.* at 190 (quotations omitted). Rickmyer argued on appeal that because he is a nonviolent pedophile, he should not be considered a psychopathic personality. *Id.* at 189. Rickmyer also argued that the evidence did not support the trial court's

determination that he is likely to inflict serious physical or mental harm to others. *Id.* at 190. The supreme court did not address Rickmyer's argument that because he is nonviolent, he should not be considered a psychopathic personality. Instead, the court reiterated its statement in *Blodgett* that

> the psychopathic personality "is an identifiable and documentable violent sexually deviant condition or disorder," and among the factors to be considered are the nature of the sexual assaults and the degree of violence involved.

*Id.* (citation omitted).

The court then reversed Rickmyer's commitment because

> the record does not support the trial court's findings that [Rickmeyer] has inflicted or is likely to inflict serious physical or mental harm on his victims. [Rickmeyer's] unauthorized sexual "touchings" and "spankings," while repellant, do not constitute the kind of injury, pain, "or other evil" that is contemplated by the psychopathic personality statute.[2]

*Id.*

Robb contends that, in *Rickmyer*, the supreme court held that a nonviolent sex offender cannot exhibit a risk of future danger where there is no violence. Respondent draws a very different conclusion from *Rickmyer* and argues that because the opinion refers to both physical and mental harm, a showing of physical violence is not required to demonstrate that a person is dangerous to other persons. We do not agree that the supreme court drew the bright line that either party claims.

---

2. This statement is confusing because, read literally, it says that Rickmyer's acts are not the kind of harm contemplated by the psychopathic-personality statute. But in *Pearson*, which the statement quotes, the court said that the psychopathic-personality statute applies to persons who are likely to commit an act that inflicts injury, loss, pain or other evil. In other words, the psychopathic-personality statute contemplates acts that cause harm, not acts that are harm. This slight misstatement does not, however, obscure the court's holding that Rickmyer could not be committed as a psychopathic personality because the record did not demonstrate that his conduct caused or was likely to cause the kind of harm that is contemplated by the psychopathic-personality statute.

In *Rickmyer*, the supreme court repeated the description of the psychopathic personality that it provided a few months earlier in *Blodgett*, which refers to violent sexual deviance and sexual assaults, but the court did not determine whether Rickmyer's behavior was nonviolent. Absent an express determination of this critical fact, we cannot conclude that the supreme court simply accepted Rickmyer's characterization of his sexual offenses as nonviolent and reversed his commitment because his behavior was not violent. And although the court referred to both physical and mental harm, it did not conclude that Rickmyer could be found to be dangerous to other persons even though it was not shown that his behavior was violent. The court did not conclude that Rickmyer could be found to be dangerous.

The supreme court simply did not directly respond to Rickmyer's argument that as a nonviolent pedophile, he should not be considered a psychopathic personality. Instead, the court considered the kind of harm Rickmyer's behavior caused and concluded that because Rickmyer had not inflicted and was not likely to inflict serious physical or mental harm on his victims, the harm he caused was not the kind of harm contemplated by the psychopathic-personality statute, and Rickmyer could not be committed as a psychopathic personality.

Because it is conceivable that nonviolent behavior could inflict serious physical or mental harm, it is reasonable to read *Rickmyer* as having eliminated a need to show violent behavior to demonstrate that a person is dangerous to others. It may be sufficient to show only that a person's behavior, either violent or nonviolent, is likely to inflict serious physical or mental harm. But because the supreme court repeated in *Rickmyer* the description of the psychopathic personality it had provided only months earlier in *Blodgett* and specifically stated that two of the factors to be considered when determining whether a person has a psychopathic personality are the "nature of the sexual assaults and the degree of violence involved," we conclude that the supreme court did not eliminate the need to show that a person is likely to commit violent sexual assaults in order to demonstrate that the person is dangerous to other persons. Under *Blodgett* and *Rickmyer*, behavior that makes a person "dangerous to other persons" as required by the sexual-psychopathic-personality statute is limited to violent sexual assaults that create a substantial likelihood of serious physical or mental harm being inflicted on the person's victims.

*Blodgett* and *Rickmyer* do not provide a bright line for determining when sexual assaults create a substantial likelihood of serious physical or mental harm, but the facts and holdings of the two cases provide some indication of when this line is crossed.

Rickmyer's conduct involved the use of some physical force, but it is not apparent that anything he did was likely to cause serious physical harm. He might have caused temporary pain, but he did not cause any actual physical injury. Rickmyer's conduct involved numerous sexual contacts with young boys. Although these contacts likely caused mental harm to Rickmyer's victims, there is no indication that the harm was greater than the harm that could be expected to be caused by any sexual assault. Because the supreme court held that the record did not support a finding that Rickmyer inflicted or was likely to inflict serious mental harm, serious mental harm must mean greater mental harm than would be expected in a sexual assault.

Blodgett's behavior differed markedly from Rickmyer's. In terms of physical harm, Blodgett pushed and hit one of his victims and shoved his hand in her mouth. This conduct easily could have caused physical harm, and it would not have required unusual circumstances for the harm to be serious. In terms of mental harm, it is readily apparent that Blodgett's behavior was likely to inflict serious mental

harm. Blodgett attacked one of his victims while she slept in her parent's home. He attacked another victim in a public place and threatened to kill her. And he subjected a third victim to multiple forms of sexual penetration. All of these acts were highly likely to have a serious, lasting effect on the victim's sense of security and to cause a continuing sense of fear. The physical and mental harm likely to be caused by Blodgett's behavior was greater than the physical and mental harm likely to be caused by other sexual assaults that involve some physical force.

■ Because of the significant similarities between Robb's behavior and the behavior described in *Rickmyer*, we conclude that Robb's behavior is not the kind of behavior contemplated by the sexual-psychopathic-personality statute. Like Rickmyer, Robb did not physically injure any of his victims. He sometimes restrained his victims, which could be considered to be a form of violence, but the restraint was limited and did not cause physical injury. Also like Rickmyer, Robb's behavior resulted in multiple sexual-assault convictions, which demonstrates that his behavior was sexual assaultive behavior. Finally, although Robb's sexual assaults inflicted mental harm on his victims, such as influencing how one victim trusts people, especially his children's teachers, and leaving one victim very distraught and visibly upset, this mental harm was not greater than the mental harm likely to be caused by a sexual assault.

Like Rickmyer, Robb's unauthorized sexual behavior was repellant, but it did not inflict the kind of harm that is contemplated by the sexual-psychopathic-personality statute. Therefore, we reverse Robb's commitment as a sexual psychopathic personality.

B. *Sexually Dangerous Person Commitment*

Robb also argues that his nonviolent behavior is not sufficient to establish that he will engage in acts of harmful sexual conduct as required by the sexually dangerous person statute.

When the legislature amended the psychopathic-personality statute in 1994, it also enacted an entirely new statute that permits the civil commitment of a sexually dangerous person. This statute provides:

(a) A "sexually dangerous person" means a person who:

(1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a;

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

(b) For purposes of this provision, it is not necessary to prove that the person has an inability to control the person's sexual impulses.

Minn.Stat. § 253B.02, subd. 18c (1998).

The subdivision 7a referred to in the definition of "sexually dangerous person" provides:

(a) "Harmful sexual conduct" means sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another.

(b) There is a rebuttable presumption that conduct described in the following provisions creates a substantial likelihood that a victim will suffer serious physical or emotional harm: section 609.342 (CRIMINAL SEXUAL CONDUCT IN THE FIRST DEGREE), 609.343 (CRIMINAL SEXUAL CONDUCT IN THE SECOND DEGREE), 609.344 (CRIMINAL SEXUAL CONDUCT IN THE THIRD DEGREE) * * *.

Minn.Stat. § 253B.02, subd. 7a (1998).

The supreme court has clarified that the sexually dangerous person statute

allows civil commitment of sexually dangerous persons who have engaged in a

prior course of sexually harmful behavior and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses, making it highly likely that they will engage in harmful sexual acts in the future.

*In re Linehan,* 594 N.W.2d 867, 876 (Minn. 1999).

■ Unlike the sexual-psychopathic-personality statute, which has been construed by the supreme court to require a showing that a person's behavior is violent in order to demonstrate that the person is dangerous to other persons, the sexually dangerous person statute does not require a showing of violence. Instead, the statute requires a showing that the person "is likely to engage in acts of harmful sexual conduct." Minn.Stat. § 253B.02, subd. 18c(3). And the statute defines "harmful sexual conduct" as "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." Minn.Stat. § 253B.02, subd. 7a(a). It does not require that the sexual conduct be violent. Therefore, a showing of violent behavior is not required to show that it is highly likely that Robb will engage in harmful sexual acts in the future.

■ Robb also argues that demonstrating the course of harmful sexual conduct required by the sexually dangerous person statute requires proof of egregious harm as is required under the sexual-psychopathic-personality statute, and the harm he caused was not egregious harm. But, unlike the psychopathic-personality statute, which requires a showing of sexual assaultive conduct that is likely to cause physical or mental harm that is greater than the harm typically caused by a sexual assault, the sexually dangerous person statute contains a rebuttable presumption that committing certain criminal offenses creates a substantial likelihood that a victim will suffer serious physical or emotional harm. Therefore, if a person commits one of the listed criminal offenses, it is presumed that the person's conduct is harmful sexual conduct. This presumption applies to Robb because he has been convicted of three of the listed offenses.

■ Robb contends that the evidence of the minimal physical and emotional harm he caused rebutted the statutory presumption. Although we have already indicated that the harm caused by Robb's conduct was not the egregious harm contemplated by the psychopathic-personality statute, we do not agree that the harm was sufficiently limited to rebut the statutory presumption. In one of the offenses to which Robb pleaded guilty, he forced a 12-year-old boy onto a bed, pulled down his pants, and masturbated him. In another offense, Robb pushed his victim's arms down, pinned his hands against his stomach, and performed fellatio on him. One of Robb's victims reported that Robb used "mental manipulation" on his victims. This conduct is not less serious than conduct that typically occurs in the commission of the offenses of which Robb was convicted, and Robb did not demonstrate that his victims suffered less emotional harm than other victims of the same offense would likely suffer.

■ Robb also argues that because he lived in the community for ten years without supervision and without committing any sex offenses, there was not a basis to find that he was not able to adequately control his sexual impulses or that he engaged in a course of harmful sexual conduct. It is true that Robb was released from prison in 1982 and was not convicted of another sex offense until 1993. In 1993, Robb pleaded guilty to one count of first-degree criminal sexual conduct and two counts of third-degree criminal sexual conduct for sexually assaults that occurred in 1992 and 1993. But the fact that Robb did not commit any sex offenses from 1982 until 1992 does not mean that there is not a basis for concluding that he could not adequately control his sexual impulses in 1999. The decision to commit Robb was based on his condition at the time of com-

mitment, not his condition seven to seventeen years earlier. His conduct since 1992 demonstrated that he engaged in a course of harmful sexual conduct and that he could not adequately control his sexual impulses.

### 2. *Least–Restrictive Alternative*

Robb argues that the trial court erred when it rejected the least-restrictive alternative treatment plan that he proposed at the commitment review hearing. We disagree.

In 1998, the Minnesota Supreme Court determined that there was no statutory requirement that a person committed as a sexually dangerous person must be committed to the least-restrictive alternative treatment program. *In re Senty–Haugen,* 583 N.W.2d 266, 269 (Minn.1998). The legislature has since amended the statute to give the patient an opportunity to prove that a less-restrictive treatment program is available. Under the statute, however, the burden of proving that a less-restrictive program is available is on the patient. The statute provides:

> The court shall commit the patient to a secure treatment facility unless the patient establishes by clear and convincing evidence that a less restrictive treatment program is available that is consistent with the patient's treatment needs and the requirements of public safety.

Minn.Stat. § 253B.18, subd. 1(a); *see also* Minn.Stat. § 253B.185, subd. 19.

Robb offers no clear and convincing evidence that a less-restrictive treatment program is available that is consistent with his needs and the requirements of public safety. Robb suggested several alternative treatment programs, but he presented no evidence that any other program would be willing to accept him under a judicial commitment for sex offender treatment. Dr. Hoberman testified that Alpha Human Services, an alternative Robb proposed, was inadequate for Robb's treatment needs, had no security, and was close to a public school. Dr. Parker considered out-patient possibilities for Robb, but believed that Robb should be strictly supervised under such conditions. Both Dr. Parker and Dr. Hoberman testified that Robb's course of treatment would be long and difficult, based partially on his reluctance to participate in treatment. Robb's proposed alternative provided for only a limited amount of intensive supervision and outpatient treatment. There was not clear and convincing evidence that an adequate less-restrictive alternative treatment program was available.

Robb also claims that to the extent the statute places on him the burden of proving that he is entitled to be placed in a less-restrictive alternative treatment program, the statute is unconstitutional. But Robb provided no analysis or argument in support of this claim.

> An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection.

*Schoepke v. Alexander Smith & Sons Carpet Co.,* 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971) (citation omitted).

Robb cites two opinions as support for his claim that the statute is unconstitutional, but he does not offer any analysis or argument indicating how these opinions support his claim. Under *Schoepke,* Robb has waived this claim by failing to provide any supporting argument.

### 3. *Evidentiary rulings*

Absent erroneous interpretation of the law, the question of whether to admit or exclude evidence is within the trial court's discretion. *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 45–46 (Minn.1997). "Entitlement to a new trial on the grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error."

*Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn.1990) (citation omitted).

■ Robb makes a broad argument that the trial court erred by admitting police reports and Department of Corrections documents that contained disclosures he made to his treating psychologists. His argument appears to be that he was prejudiced by allowing the court examiners to view these documents because once the documents formed the basis for an examiner's opinion, the documents became part of the record.

Minn. R. Evid. 703 provides:

(a) The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) Underlying expert data must be independently admissible in order to be received upon direct examination; provided that when good cause is shown in civil cases and the underlying data is particularly trustworthy, the court may admit the data under this rule for the limited purpose of showing the basis for the expert's opinion. Nothing in this rule restricts admissibility of underlying expert data when inquired into on cross-examination.

The trial court concluded that the police reports are the type of document that is routinely relied on by experts in commitment cases. The trial court admitted the documents under Minn. R. Evid. 803(6), the business records exception to the hearsay rule, and, therefore, did not consider whether the underlying data in the documents were particularly trustworthy as required by Minn. R. Evid. 703(b). But under Minn. R. Evid. 803(6), business records may not be admitted if "the method or circumstances of preparation indicate lack of trustworthiness." Consequently, the trial court did consider the trustworthiness of the documents before admitting them. Robb has not demonstrated on appeal how the trial court's analysis under rule 803(6) rather than rule 703(b) was prejudicial.

■ Robb argues that various psychological assessments and probation pre-sentence reports should be excluded from evidence because no Tennessen warnings were given to him at the time he provided data contained in the reports. Minn.Stat. § 13.04, subd. 2 (1998) provides:

An individual asked to supply private or confidential data concerning the individual shall be informed of: (a) the purpose and intended use of the requested data within the collecting state agency, political subdivision, or statewide system; (b) whether the individual may refuse or is legally required to supply the requested data; (c) any known consequence arising from supplying or refusing to supply private or confidential data; and (d) the identity of other persons or entities authorized by state or federal law to receive the data. This requirement shall not apply when an individual is asked to supply investigative data, pursuant to section 13.82, subdivision 5, to a law enforcement officer.

The warning required by this statute is known as a "Tennessen warning." And although Robb might have been entitled to receive the warning when he provided data, Robb has cited no authority that indicates that the failure to receive the warning makes documents that contain the data he provided inadmissible in a court proceeding. Minn.Stat. § 13.08 (1998) provides civil remedies for violating any provision of chapter 13, but these remedies do not make government data inadmissible as evidence.

■ Finally, Robb argues that certain records should be protected by the privilege for communications between him and his therapists. "The medical privilege is a statutory privilege and not a constitutional right." *In re D.M.C.,* 331 N.W.2d

236, 238 (Minn.1983) (citing *State v. Enebak*, 272 N.W.2d 27, 30 (Minn.1978)). Minn.Stat. § 253B.23, subd. 4 (1998), provides:

> Any privilege otherwise existing between patient and physician, patient and psychologist, patient and examiner, or patient and social worker, is waived as to any physician, psychologist, examiner, or social worker who provides information with respect to a patient pursuant to any provision of this chapter.

Consequently, the privilege Robb claims is waived in commitment proceedings.

### DECISION

Because Robb's behavior was not the kind of behavior that is contemplated by the sexual-psychopathic-personality statute, we reverse his commitment as a sexual psychopathic personality. Because the requirements for commitment under the sexually dangerous person statute were proved by clear and convincing evidence, we affirm Robb's commitment as a sexually dangerous person. Robb did not meet his burden of proving that a less-restrictive treatment program is available that is consistent with his treatment needs and the requirements of public safety. The trial court's evidentiary rulings do not include any prejudicial error.

**Affirmed in part and reversed in part.**