### In re the Matter of Leon James PRESTON.

### No. C5–00–1715.

Court of Appeals of Minnesota.

June 12, 2001.

Anthony F. Nerud, Arlington, MN, (for appellant).

Mike Hatch, Attorney General, Gail A. Feichtinger, Assistant Attorney General, St. Paul, MN, (for respondent).

Considered and decided by AMUNDSON, Presiding Judge, KLAPHAKE, Judge, and WILLIS, Judge.

## OPINION

AMUNDSON, Judge

The district court ordered the indeterminate commitment of appellant as both a sexual psychopathic personality and a sexually dangerous person. Appellant argues that there is insufficient evidence to establish that he has an utter lack of power to control his sexual impulses or that he has exhibited a habitual course of misconduct in sexual matters so as to support commitment as a sexual psychopath. Appellant also argues that there is insufficient evidence to establish that he is likely to engage in harmful sexual conduct, as required for commitment as a sexually dangerous person. Lastly, Appellant argues that the court abused its discretion in im-

posing time constraints on the examination of expert witnesses.

## FACTS

This case concerns the indeterminate commitment of Leon James Preston as a sexual psychopathic personality and a sexually dangerous person pursuant to Minn. Stat. § 253B.02, subds. 18b, 18c (2000). Preston, a 25-year-old man diagnosed with pedophilia and antisocial personality disorder among other disorders, sexually assaulted eight juvenile females when he was between the ages of 14 and 17.

In 1990, when Preston was 14, he was playing a game with his eight-year-old female cousin at her house. After she went into her bedroom to change out of her swimsuit, he followed her, removed her shirt and pants, placed her on the bed, and touched her between the legs. After being informed of the incident, her family and Preston's family responded to this incident privately and sought counseling for the girl.

The following spring, in 1991, Preston fondled the vaginal area of a nine-year old girl on approximately 30 to 45 separate occasions while the two were riding on a school bus.

That fall, Preston, then 15, twice sexually assaulted a four-year-old-girl in a park. He first spotted the girl near a concession stand, and then approached and offered her candy, which she refused. According to Preston, after he set the candy bar down by her, she began to trust him and picked up the candy. To put her further at ease, he began to talk to her. At that point, he began fondling her, initially on top of her swimsuit, putting his arm around her so she could not get away, all the while continuing to give her candy. The girl struggled during the assault and wanted to escape, but Preston held her on his lap. He then put his hand under her swimsuit and attempted to fondle her vagina. Finding this too difficult, he lifted the girl up, removed her swimsuit, and fondled her breasts and vaginal area. He then put the swimsuit back on and continued to fondle her. At a later date, Preston returned to that park, again gave the same girl some candy, and fondled her on top of and underneath her clothing.

During February 1992, when Preston was 16, he assaulted another eight-year-old girl at a park on at least 15 separate occasions. Preston would follow her into a bathroom and fondle her vagina and breasts both on top of and underneath her clothing, asking her if she "liked it." He also fondled her in the same manner approximately 35 times on a school bus. Preston used planning and stalking behaviors with this victim.

In April 1992, Preston assaulted J.M.R., his five-year-old half-sister, during his confirmation party. While she was playing hide and seek with some other children, Preston hid in his grandparents' garage. When she entered the garage, Preston picked her up, placed her on a lawnmower, and began to fondle her breasts and vagina, forcing her to stay there. Preston then removed her tights, performed cunnilingus on her, and digitally penetrated her vagina. In August 1992, Preston again assaulted her at a cousin's house. Preston suggested they play hide and seek, and when she went into the garage, Preston followed her, touched her breasts under her shirt and pulled down her pants and touched her between her legs.

Between March and June of 1992, Preston repeatedly sexually assaulted L.S., a nine-year-old neighborhood girl, in a park, on the school bus, and at her house. The first assault occurred while Preston was baby-sitting her and her siblings at the park. When L.S. went into the bathroom,

he followed her, and, once inside, fondled her breasts and vagina both on top of and underneath her clothing, removed her clothes, and masturbated in front of her. L.S. was visibly terrified. Later that day, he told L.S. to go to her room and remove her clothes. After she complied, he fondled her, masturbated in front of her, and performed cunnilingus on her, asking her if she liked it. Throughout the spring of 1992, he also touched her on top of her clothing while they rode a school bus together. These school-bus incidents occurred every other day, totaling approximately 60 incidents; the assaults only stopped when L.S. moved and began riding a different bus to school. Even then, Preston would drive by her residence. During these assaults, Preston prevented L.S. from leaving and was indifferent about whether he was hurting her.

On September 14, 1992, a juvenile petition was submitted for the offenses Preston had committed against J.M.R. He attempted outpatient sex offender counseling through the Leo Hoffman Center. From May 1993 through July 1993, while in outpatient treatment, he fondled A.D., the five-year-old daughter of his father's girlfriend, on at least seven different occasions—performing cunnilingus on her during at least four of these assaults. In one particular incident, Preston was watching a pornographic movie when A.D. entered the room. A.D. started watching the movie with him and asked what a penis was. Preston then removed his pants, showed her his penis, and had her fondle him while he ejaculated. He then performed cunnilingus on her. In another incident, after watching a pornographic movie, Preston took A.D. outside with him and placed her on his lap while he mowed the lawn; he had an erection and was fondling her breasts. After parking the mower in the garage, he removed her clothing and masturbated in front of her, after which he then performed cunnilingus on her before returning to the house to watch more pornographic movies. While he was watching the movies, A.D. walked into the room, and Preston again fondled her, and performed cunnilingus on her, made her fondle him and masturbated in front of her. During many other instances, Preston rubbed his penis between her legs and unsuccessfully tried to persuade A.D. to perform fellatio on him.

On July 15, 1993, Preston was adjudicated delinquent on the offense of criminal sexual conduct in the fifth degree for the August 1992 offense against J.M.R.

Earlier that year, Preston had occasionally gone to visit the home of one of his father's friends whose family was helping him deal with family problems. Over time, the family observed Preston talking sexually to E.D., their 12-year-old daughter; Preston was banned from the house. However, after failing and being discharged from the Hoffman Center outpatient program (but before being admitted to the in-patient program), Preston went to E.D.'s house to help fix a lawn mower. When E.D.'s father left to get a part for the mower, Preston went in the house and began watching television with E.D. and her brother. The brother started tickling his sister and Preston joined in. When the brother left the room, Preston talked to E.D. about sensitive parts of the human body and convinced E.D. to remove her shirt. He then fondled her breasts. He then convinced her to remove her pants. He fondled her vagina, performed cunnilingus on her, and masturbated in front of her.

Preston, then 17, next attempted in-patient treatment at the Hoffman Center but on two separate occasions had sexual contact with a 14–year–old male resident—in violation of the program rules. Both

times, Preston successfully convinced the reluctant boy to perform fellatio on him. Preston was removed from the Hoffman Center program.

After Preston's commitment to the commissioner of corrections, he again attempted and failed sex-offender counseling at Minnesota Correctional Facility at Sauk Centre. He was discharged from supervision by the commissioner of corrections on October 31, 1994. In August 1994, Preston was charged with first-degree criminal sexual conduct for the April offense against his J.M.R., first-degree criminal sexual conduct for the offenses against A.D., and second-degree criminal sexual conduct for the offenses against L .S. From August 8, 1994 until he was released on bail on March 3, 1995, Preston was incarcerated in several county jails. While out on bail, he resided with his father near Jordan, Minnesota and was employed at both Valleyfair amusement park and a Hardee's restaurant. During this time, no allegations were raised regarding any improper sexual activity. On January 17, 1996, Preston was convicted of second-degree criminal sexual conduct. He was sentenced and incarcerated at Minnesota Correctional Facility—St. Cloud.

On September 27, 1999, a verified petition was filed for judicial commitment as a sexual psychopathic personality and a sexually dangerous person, pursuant to Minn. Stat. § 253B.02, subds. 18b, 18c. At that time, Preston was serving a sentence at the Minnesota Correctional Facility at Lino Lakes. His target supervised release date was December 23, 1999. The district court appointed psychologists James Alsdurf, Ph.D., and John Austin, Ph.D., as court appointed examiners.

At the trial on the commitment petition, both expert psychologists testified that Preston had exhibited a habitual course of sexual misconduct. Dr. Alsdurf testified that Preston met all of the criteria for commitment under both the sexual psychopathic personality and sexually dangerous person statutes. Dr. Austin agreed as to the sexually dangerous person statute, but could not make a conclusion as to the sexual psychopathic personality statute because the sexual psychopathic personality statute requirement of an "utter lack of power to control" one's sexual impulses involves a legal definition and not a psychological one. However, Dr. Austin did testify that many of Preston's offenses were "impulsive" in that they were not planned out and were simply responses to an unknown set of stimuli. Dr. Austin further testified that Preston lacks the ability to choose when to exercise control over his sexual impulses. Dr. Alsdurf testified that Preston believed his offenses to be habitual.

Dr. Austin referred to Preston as a "manipulative pedophile" who was able to repeatedly assault some victims after gaining their confidence. This behavior, according to Dr. Alsdurf, was substantially likely to result in serious emotional harm to the victims. Both psychologists documented the actual emotional and psychological damage to one of the victims.

Both psychologists also testified that the results of several psychological tests showed Preston to be highly impulsive, self-centered, and anti-social—indicating that he was a psychopath. Both also noted that Preston did not seem to recognize that he has a problem and did not believe that sex offender treatment was necessary or would be beneficial. Preston indicated to them that he thought that he could design a program for dealing with his issues. He suggested that his treatment might consist of his joining a program designed for "sex addicts." The psychologists described this plan as vague, inade-

quate, insufficient, unrealistic, and "strikingly shallow."

The district court issued its order for initial commitment, committing Preston to the Minnesota Sex Offender Program at St. Peter and at Moose Lake as both a sexually dangerous person and a sexual psychopathic personality. Following a review hearing on May 9, 2000, the district court made Preston's commitment indeterminate. Preston appeals both the initial commitment order and the indeterminate commitment order.

## ISSUES

I. Does the sexual psychopathic personality statute permit the indefinite commitment of individuals with an extensive history of sexual assaults against children involving both coercion and physical restraint?

II. Did the district court err in finding that Preston was highly likely to engage in harmful sexual conduct?

III. Was Preston prejudiced by the imposition of time constraints with regard to the cross-examination of the court-appointed psychological examiners?

## ANALYSIS

### I.

 To commit a person as a sexual psychopathic personality, the petitioner must prove, by clear and convincing evidence, that the person has "evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses." Minn. Stat § 253B.02, subd. 18b (1998). The reach of the sexual psychopathic personality statute has been limited, however. *In re Linehan,* 518 N.W.2d 609, 613 (Minn.1994) (*Linehan I*). While excluding "mere sexual promis-

cuity," and "other forms of sexual delinquency," a psychopathic personality "is an identifiable and documentable violent sexually deviant condition or disorder." *In re Blodgett,* 510 N.W.2d 910, 915 (Minn.1994) (footnotes omitted). Commitment pursuant to this statute requires there be (a) a habitual course of misconduct in sexual matters, (b) an utter lack of power to control sexual impulses so that (c) it is likely the person will attack or otherwise inflict injury, loss, pain, or other evil on the objects of their uncontrolled and uncontrollable desire. *Linehan I,* 518 N.W.2d at 613.

With regard to the district court's conclusion that Preston has a sexual psychopathic personality, Preston does not deny engaging in a habitual course of misconduct in sexual matters. Instead, he limits his challenge to the district court's findings that he has an utter lack of power to control his sexual impulses and that he is dangerous to other persons within the meaning of the sexual psychopathic personality statute.

 Findings of fact must be affirmed if they are not clearly erroneous. *See, e.g., In re Joelson,* 385 N.W.2d 810, 811 (Minn.1986). Whether or not the record supports the trial court's conclusions with regard to these elements is a question of law, which this court reviews de novo. *Linehan I,* 518 N.W.2d at 613.

### *Utter Lack of Power to Control*

 The Minnesota Supreme Court has limited the application of the psychopathic personality statute to include only those persons who are likely to attack or otherwise inflict injury on the objects of their uncontrollable desire as a result of this lack of control.[1] *State ex rel. Pearson*

---

1. We consider several factors in determining

whether the person exhibits a predatory sexu-

*v. Probate Court,* 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). But, "[i]f a person has the ability to control the sexual impulse, the standard for commitment is not met." *In re Pirkl,* 531 N.W.2d 902, 907 (Minn.App.1995) (citations omitted), *review denied* (Minn. Aug. 30, 1995). Preston argues that the district court erred in finding an utter lack of power to control because evidence that he was able to plan his assaults, groom victims, and wait for an opportune time to offend suggests that he has exhibited some control over his impulses.

■ Preston overstates the importance of the evidence of grooming behavior. Though grooming and planning behavior can show the ability to control the sexual impulse,[2] where the grooming behavior itself is uncontrollable, the impulse is likewise not controllable. *See In re Bieganowski,* 520 N.W.2d 525, 530 (Minn.App. 1994) (grooming behavior did not preclude a finding of "utter lack of control" when grooming behavior itself was uncontrollable and offender failed to remove himself from situations that provided him the opportunity to re-offend), *review denied* (Minn. Oct. 27, 1994). Here, Dr. Austin, like the expert in *Bieganowski,* specifically referred to Preston's offenses against girls "that he just happened upon" in the park

as evidence of Preston's impulsive reaction to a set of circumstances. Dr. Austin characterized Preston as having unpredictable sexual responses to certain external factors, and testified that some of his offenses were not planned out ahead of time. Likewise, Dr. Alsdurf specifically testified that Preston's grooming did not indicate control over his impulses. Furthermore, even though many of Preston's assaults appear to involve grooming behavior, it is equally clear that many did not.

Preston next argues that his ability to control his impulses is demonstrated by the dearth of evidence that he re-offended while released on bail even though, during this time, he was immersed in his "target" population of pre-pubescent females through his employment. But both experts expressly testified that the ten-month period that Preston was out on bail was insufficient to demonstrate that he could control his sexual impulses.[3] Furthermore, both psychologists gave extensive testimony regarding the inadequacy of Preston's self-evaluation. This court has held such inadequacies to be indicative of an offender's lack of self-control. *Irwin,* 529 N.W.2d at 375. Accordingly, the district court's finding with regard to Preston's utter lack of power to control his sexual impulses is supported.

al impulse and the lack of power to control it. *Blodgett,* 510 N.W.2d at 915. These include the nature and frequency of sexual assaults, the degree of violence involved, the relationship or lack thereof between the offender and victims, the offenders attitude and mood, the offenders medical and family history, and the results of psychological and psychiatric testing and evaluation. *Id.* Another relevant factor may be whether the person feels that he or she has a problem. *In re Irwin,* 529 N.W.2d 366, 375 (Minn.App.1995), *review denied* (Minn. May 16, 1995). It is not disputed that most of these factors support a finding of Prestons inability to control his predatory sexual impulses.

2. *See, e.g., In re Schweninger,* 520 N.W.2d 446, 450 (Minn.App.1994) (evidence that nonviolent sexual assaults were planned, calculated and involved seductions, payments, coercion, and grooming behavior, was insufficient to support a finding of "utter lack of control"), *review denied* (Minn. Oct. 27, (1994))

3. The fact that Preston chose employment at Valleyfair is especially troubling, and certainly buttresses the psychologists' claims that Preston is more likely to re-offend because he does not appreciate his problem.

## Dangerousness

■ Preston next argues that the petitioner failed to show that his particular pattern of sexual misconduct is so egregious that there is a sufficiently substantial likelihood of serious physical or mental harm being inflicted on the victims so as to meet the "dangerous to other persons" requirement for commitment as a psychopathic personality. *See* Minn.Stat. § 253B.02, subd. 18b (1998); *In re Rickmyer*, 519 N.W.2d 188, 190 (Minn.1994).

■ There are two intertwined sub-issues involved with the question of future dangerousness: whether Preston is likely to continue to engage in an uncontrollable pattern of behavior in the future, and whether the kind of behavior that Preston has thus far exhibited warrants commitment under the sexual psychopathic personality statute. Dangerousness as it relates to the first issue is predicated on the utter lack of ability to control sexual impulses. *Linehan I*, 518 N.W.2d at 614. Where, as here, utter uncontrollability of sexual impulses is found, the district court, in predicting serious danger to the public, should consider six factors: (1) the offender's relevant demographic characteristics; (2) the offender's history of violent behavior (with special attention to recency, severity, and frequency of violent acts); (3) the base rate statistics for violent behavior among individuals of this offender's background; (4) the sources of stress in the environment; (5) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (6) the person's record with respect to sex therapy programs. *Id.*

Although the supreme court, in *Linehan I*, did not require courts to find that all these factors be met, in *Schweninger*, this court noted that four of these factors pertain to the violence exhibited by the person in the past as predictors of dangerousness. 520 N.W.2d at 450. Preston characterizes his crimes as "particularly non-violent" and therefore similar to cases in which this court and the supreme court have found the behavior in question to be insufficiently violent to come within the ambit of the sexual psychopathic personality statute. *See, e.g., Rickmyer*, 519 N.W.2d at 190; *In re Robb*, 622 N.W.2d 564, 572 (Minn.App. 2001), *review denied* (Minn. Apr. 17, 2001); *Schweninger*, 520 N.W.2d at 450–51.

In *Schweninger*, we held that,

> absent a showing of violence, persons in the class of repetitive pedophiles cannot be committed as psychopathic personalities, unless shown to have committed *violent* acts in the past, and shown to have such an utter lack of power to control their behavior that they are likely to do so in the future.

520 N.W.2d at 450. In so holding, the *Schweninger* majority relied on language in *Rickmyer* that noted that, in psychopathic personality cases, there is ordinarily "a pattern of sexual assaults creating the danger of infliction of serious physical harm." *Schweninger*, 520 N.W.2d at 449 (quoting *Rickmyer*, 519 N.W.2d at 188). The *Schweninger* court then concluded that the offender's behavior did not exhibit the requisite violence because the victims were coerced into participating in the acts.[4] *Id.* at 450.

4. Although the supreme court in *Rickmyer* indicated that *physical* harm would ordinarily be the result of the "violent sexually deviant condition," *Rickmyer*, 519 N.W.2d at 190 (citation omitted), we note that physical harm, or even the risk of physical harm, is not a requirement for commitment under the sexual psychopathic personality statute. As the court in *Rickmyer* noted, the requirements for commitment may be met with misconduct that creates the substantial likelihood of mental harm as well. *Id.*

Although Preston, like the offender in *Schweninger*, sometimes used coercion to commit his offenses, unlike in *Schweninger*, there was evidence in the record that Preston also used physical force to restrain his victims. Because Preston did not rely purely on coercion, but also this physical restraint, the *Schweninger* "coercive pedophile" analysis does not apply here.

The collateral physical force used by Preston in restraining his victims was sufficient, by itself, to support a finding that Preston's pattern of sexual misconduct was violent. Preston himself admitted that he used "force" with all of his victims, that they tried to get away from him, and that he prevented them from leaving despite their evident fear. Dr. Alsdurf specifically noted that the physical force used by Preston was proportionate to what was needed to sexually offend children.

We recognize that a recent panel of this court has held that limited restraint of a victim that does not cause physical injury itself, is not the kind of violence contemplated by the sexual-psychopathic-personality statute. *Robb*, 622 N.W.2d at 572. We disagree. A key conclusion of the *Robb* panel was that the behavior in that case was similar to that in *Rickmyer*. *Id.* Notwithstanding that conclusion, we believe the character of Preston's behavior to be dramatically different from that in *Rickmyer*. Whereas Rickmyer had committed unauthorized "touchings and spankings," Preston has engaged in over 100 incidences of impermissible sexual contact with eight different victims—some as young as four-years old. These contacts involved oral sexual contact and vaginal penetration. He victimized some young girls as many as sixty different times. In *Rickmyer*, one psychologist and one psychotherapist testified that they did not believe that Rickmyer was a pedophile. 519

N.W.2d at 189. In contrast, here, both Drs. Austin and Alsdurf characterize Preston as a pedophile. Although neither Preston nor Rickmyer caused physical injury collateral to their assaults themselves, this does not mean that Preston's assaults were non-violent within the meaning of the sexual psychopathic personality statute. Preston only engaged in the amount of force necessary to accomplish his will on very young victims, but this amount of force was violence nonetheless. It would be absurd to hold that because less force was needed to subdue an extremely young victim, the assault was non-violent.

Furthermore, even if Preston had not used force, the character and nature of his sexual acts alone were sufficient for indeterminate commitment. This is not a situation where Preston engaged in "touchings and spankings;" the sexual acts themselves were extremely violent. The supreme court has not suggested that the question is whether the violence was greater than that involved in "other sexual assaults that involve some physical force," *see Robb*, 622 N.W.2d at 572 (comparing the degree of violence involved to "other sexual assaults"), but whether it was violent to the point of creating "a substantial likelihood of serious physical or mental harm." *Rickmyer*, 519 N.W.2d at 190. Preston's behavior involved impermissible sexual contact (including oral sexual contact and vaginal penetration) with victims as young as four-years old, and he victimized many of the children repeatedly. The court received expert testimony that the character of Preston's acts was such that psychological harm would be a likely consequence for his victims. There can be no question that this pattern of behavior is so egregious so as to create the "substantial likelihood of physical or mental harm." *Rickmyer*, 519 N.W.2d at 190.

## II.

Preston next challenges the district court's conclusion that he is a sexually dangerous person. A sexually dangerous person means a person who (1) has engaged in a course of harmful sexual conduct; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct. Minn.Stat. 253B.02, subd. 18c(a) (2000). Preston challenges the court's determination that he is highly likely to engage in acts of harmful sexual contact, a finding that must be proven by clear and convincing evidence. *In re Linehan,* 594 N.W.2d 867 (Minn.1999) (*Linehan IV* ), *cert. denied,* 528 U.S. 1049, 120 S.Ct. 587, 145 L.Ed.2d 488 (1999).

The sexually dangerous person statute allows civil commitment of persons

who have engaged in a prior course of sexually harmful behavior and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses, making it highly likely that they will engage in harmful sexual acts in the future.

*Id.* at 876. Under this statute, the inability to control an offender's sexual impulses need not be proven. Minn.Stat. § 253B.02, subd 18c(b). Rather, the statute

requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior.

*Linehan IV,* 594 N.W.2d at 875 (citations omitted).

The district court made express findings regarding Preston's mental disorders that were substantiated by the psychologists' diagnoses. The district court also found that Preston is highly likely to engage in acts of harmful sexual conduct in the future. The court's findings in this regard refer both to his personal attributes and to the demography of his victim pool. The court also noted that various psychological tests administered to Preston indicated him to be an extremely high risk for re-offending. Preston's past history also indicates his propensity to re-offend. In fact, one of his assaults occurred during outpatient treatment. Finally, Preston's attitude with regard to his problem indicates that he is highly likely to re-offend. For example, his statement that he would "try" to avoid baby-sitting and his decision to seek employment at an amusement park both illustrate the extent to which he is unable to assess the gravity of his problem. Both doctors testified that such unrealistic assessments indicate an individual who is highly likely to relapse. The court's finding with regard to the likelihood of re-offending per the sexually dangerous person law is thoroughly supported in the record.

## III.

Preston argues that the district court erred by arbitrarily and unreasonably imposing "significant and burdensome" time constraints on the cross-examination of the court-appointed psychologists. The record shows that, at certain points during the trial, the court did, in fact, impose time restraints in order to avoid having to have an expert witness return at a later date. But the record also shows that Preston did not object to the imposition of these time restraints. In fact, Preston's attorney, speaking on behalf of both attorneys, proposed several solutions to the time issue and prefaced his suggestions by stating,

I don't want either of us to have a basis for appeal based on limitations of time.

I think there are several options the court can consider.

After discussions of different alternatives and some further off-the-record discussions, this issue was never again raised. Matters not argued and considered in the court below will not be considered here. *Roby v. State,* 547 N.W.2d 354, 357 (Minn. 1996). Regardless, the mode, manner, and method of receiving testimony rest almost wholly in the discretion of the trial court. *Manion v. Tweedy,* 257 Minn. 59, 67–68, 100 N.W.2d 124, 130 (1959). Preston has failed to show an abuse of that discretion.

## DECISION

Because Preston has exhibited a pattern of perpetrating violent sexual assaults and otherwise meets the definitions of a sexually psychopathic personality and sexually dangerous person, indeterminate commitment is proper.

**Affirmed.**